**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GLOBAL CORD BLOOD CORPORATION,<br><br>Debtor in a Foreign Proceeding.[1] | Chapter 15<br><br>Case No. 22-____ (___) |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF (I) VERIFIED
CHAPTER 15 PETITION FOR RECOGNITION OF FOREIGN PROCEEDING AND
RELATED RELIEF AND (II) APPLICATION TO APPROVE NOTICE PROCEDURES
PURSUANT TO CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:[2]

1. I am one of the court-appointed Joint Provisional Liquidators (the "JPLs") of Global Cord Blood Corporation (the "Debtor") pursuant to an order (the "Order") of the Grand Court of the Cayman Islands (the "Grand Court") dated September 22, 2022 in a proceeding with cause number FSD 108 of 2022 (IKJ) (the "Cayman Proceeding") pursuant to the Cayman Islands' Companies Act (2022 Revision) (the "Cayman Act"). Through counsel, the JPLs have contemporaneously filed the Verified Petition and Notice Application. I submit this declaration (the "Declaration") in my statutory capacity as an officer of the Grand Court and on behalf of the Debtor, whose interests I represent, seeking recognition of the JPLs' appointment and the further assistance of this Court, as contemplated by the Order.

---

[1] The Debtor's Cayman Islands company registration number is 227732. The Debtor's registered office is located at Mourant Governance Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Verified Chapter 15 Petition for Recognition of Foreign Proceeding and Related Relief* (the "Verified Petition") or the Notice Application, as applicable.

2.   I submit this Declaration in support of (a) the Verified Petition and (b) the Notice Application. I am an individual over the age of eighteen and, if called upon, could testify to all matters set forth herein.

3.   I am a Managing Director of Grant Thornton Specialist Services (Cayman) Limited, and a qualified insolvency practitioner in the Cayman Islands, meeting the statutorily prescribed requirements under the Cayman Insolvency Practitioners' Regulations (2018 Revision) to act as a liquidator. My fellow JPL, John Royle, also has these qualifications. Our fellow JPL, Chow Tsz Nga Georgia, is a Managing Director of Grant Thornton Recovery & Reorganisation Limited, and a liquidator in Hong Kong and a "foreign practitioner" within the meaning of section 89 of the Cayman Act. I have personally served as a court-appointed joint liquidator of over one hundred Cayman Islands companies.

4.   I am familiar with Chapter 15 of the Bankruptcy Code, having been found to be a foreign representative in prior Chapter 15 cases in this Court, for example, the estate of William and Patricia Millard, the SPhinX Group of Companies, China Medical Technologies, and Platinum Partners Value Arbitrage Intermediate Fund Ltd.

5.   The other JPLs and I were recently appointed on September 22, 2022 by court order and our investigations are at an early stage. The Cayman Proceedings are still in progress and no final determination of them has been made. As a JPL, I am an independent officeholder, tasked with performing a thorough and full investigation and providing regular reports back to the Grand Court. Accordingly, I am still at an early stage of investigating the matters set out below and the evidence expressed herein must be viewed with that caution in mind.

6.   Nevertheless, the Grand Court has expressed significant concerns about the conduct of the Debtor and its management, including largely unanswered allegations of a substantial fraud,

2

involving forgery of bank statements for the purpose of filing them in evidence in the Grand Court. All of this, if true, is extremely concerning and has prompted the Grand Court to observe that, "*it is difficult to imagine a stronger case for appointing provisional liquidators than the present situation.*"  September 28 Judgment (Ex. E hereto) ¶ 27.  Nothing in my investigations to date contradicts these concerns.

7.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents (including court papers and orders), and/or my opinion based upon my experience and current understanding of the Debtor's industry, operations, and financial condition.

8.     I have annexed as Exhibits hereto certain of the documents on which my understanding is based.  In particular, in addition to the Order (a copy of which is annexed hereto as **Exhibit A**), there is Blue Ocean's initial Winding Up Petition dated May 5, 2022 (the "Initial Petition," a copy of which is annexed hereto as **Exhibit B**) and Amended Winding Up Petition dated September 22, 2022 (the "Amended Petition," a copy of which is annexed hereto as **Exhibit C**[3]), which set out the grounds for seeking a just and equitable winding-up of the Debtor.  The facts below are primarily based on the evidence filed by Blue Ocean in the Grand Court, which I have reviewed.  For present purposes, I am relying on that evidence as being accurate as the JPLs' investigations to date have not disclosed any reason to doubt the accuracy of that evidence.  I also cite to the Grand Court's Judgment dated 29 July 2022 (the "July 29 Judgment," a copy of which

---

[3] The Amended Petition (Ex. C) is in redline format because the relevant procedural rules in the Cayman Islands, Order 20, rule 13 of the Grand Court Rules (1995 Revision) provide for the amended copy which is filed at the Grand Court to make clear what has been deleted or altered so that the Grand Court, when reading the amended document, shall be able to see at once the exact nature and the extent of the amendments made.  A first amendment must be in red ink.

3

is annexed hereto as **Exhibit D**), and Judgment dated 28 September 2022 (the "September 28 Judgment," a copy of which is annexed hereto as **Exhibit E**).

## BACKGROUND

**I.    The Debtor's Business**

9.    The Debtor is an exempted company registered by way of continuation in the Cayman Islands on June 30, 2009 with registration number 227732.[4] *See* Initial Petition (Ex. B) ¶ 1. The Debtor's registered office was located at Conyers Trust Company (Cayman) Limited, 2nd Floor, Cricket Square, PO Box 2681, Grand Cayman KY1-1111, Cayman Islands, *see id.*, until shortly after the JPLs' appointment, when the JPLs changed the location of the Debtor's registered office to Mourant Governance Services (Cayman) Limited, 94 Solaris Avenue, Camana Bay, PO Box 1348, Grand Cayman KY1-1108, Cayman Islands, effective September 30, 2022.

10.    The Debtor's shares were publicly traded on the New York Stock Exchange (the "NYSE") with the ticker symbol "CO" from November 19, 2009 until September 23, 2022, when the NYSE halted trading in the Debtor's shares as an indirect result of the Order. *See* Initial Petition (Ex. B) ¶ 4. The Debtor remains listed on the NYSE despite the halt in trading.

11.    The Debtor's majority shareholder has been Blue Ocean Structure Investment Company Limited ("Blue Ocean") since December 30, 2016, when Blue Ocean acquired 65% of the Debtor's shares from Golden Meditech Holdings Limited ("GMHL"). *See* September 28 Judgment (Ex. E) footnote 6.

12.    The Debtor is a holding company, which wholly owns certain companies that conduct the business of storing umbilical cord blood, mainly to enable parents to preserve their

---

[4] At the time of its registration, the Debtor's name was "China Cord Blood Corporation." The name was changed by special resolution at an extraordinary meeting of shareholders on March 16, 2018. *See* Initial Petition (Ex. B) ¶ 3.

children's stem cells (the "Business"). *See* Initial Petition (Ex. B) ¶ 2. The Business is conducted principally in the People's Republic of China ("PRC") and reportedly is the largest such business in the PRC. *See* Initial Petition (Ex. B) ¶ 2. Prior to the appointment of the JPLs, the Business was overseen from an office in Hong Kong. *See id.*

13. In recent years, prior to the appointment of the JPLs, the Debtor has engaged and, the JPLs believe, has paid several service providers based in the United States, including financial services providers, accountants, and attorneys. By way of example, in relation to the transaction described further below:

- (a) Easton Capital Corp, 767 Third Avenue, 29th Floor, New York, NY 10017 were engaged by the Debtor to provide an analysis of certain technology developed, licenced or owned by Cellenkos, Inc ("Cellenkos") to the Company;

- (b) Kroll Corporate Finance, 55 East 52nd Street, 17th Floor, New York, NY, 10055 ("Kroll") were engaged by the Debtor to provide a valuation analysis to the Company;

- (c) Redwood Valuation Partners, LLC 1200 Westlake Avenue North Suite 905, Seattle, WA 98109 were engaged by the Debtor to provide a report estimating the fair market value of Cellenkos; and

- (d) Continental Stock Transfer & Trust, 1 State Street, 30th Floor, New York, NY 10004-1561 ("Continental") were engaged by the Debtor as a transfer agent; and

- (e) U.S.-based law firms Loeb & Loeb LCC, were engaged as U.S. counsel, and Cleary, Gottlieb, Steen & Hamilton LLP, were engaged as U.S. counsel for the Debtor's special committee.

14. Based on the JPLs' investigation to date, we believe that the Debtor has at least the following property in New York City:

- (a) its NYSE listing;

- (b) its shares register, which is, according to the Debtor's evidence, in Continental's possession, *see* July 29 Judgment (Ex. D) ¶¶ 32(b) and 31(d); and

- (c) a retainer in excess of fees incurred, held by Kroll.

15. In addition, the JPLs are investigating a transaction that involves the acquisition by the Debtor of approximately 95% of the outstanding shares of common stock of Cellenkos (which is a Delaware corporation based in Houston) and whether the Debtor's funds or other assets were transferred to Cellenkos or its shareholders (or others) preceding their appointment, illegitimately. This transaction is described in further detail below.

## II. The Cayman Proceeding

16. The Cayman Proceeding was commenced by Blue Ocean by the Initial Petition (Ex. B) filed in the Grand Court on May 5, 2022 and subsequently amended by the Amended Petition (Ex. C) filed on September 22, 2022.

### a. The Transaction

17. The Cayman Proceedings arose as the result of a proposed series of agreements between the Debtor, on the one hand, and Cellenkos and other entities, on the other hand, first announced publicly by the Debtor's Form 6-K filing with the U.S. Securities and Exchange Commission on April 29, 2022 (collectively, the "Transaction"). *See* Amended Petition (Ex. C) ¶ 22. The full details of and around the Transaction – including the degree to which it was properly authorized (or not), the degree to which it was legal (or not), the extent to which it was consummated (or not), and the ultimate parties in interest – are highly disputed. As mentioned above, the JPLs have only recently begun to investigate the Transaction, and thus the summary below is based on my and my colleagues' current understanding, which will likely be modified as our investigation proceeds.

18. In the Transaction, the Debtor would purchase at least 95% of Cellenkos's common stock, enter into certain employment agreements with two Cellenkos principals, and purchase certain intellectual property allegedly necessary to develop Cellenkos's products, which related to

6

the potential use of umbilical cord blood to treat disease. *See* Amended Petition (Ex. C) ¶ 22. The aggregate consideration to be paid by the Debtor was (i) 114,212,267 newly issued shares in the Debtor, which as of April 29, 2022 had 121,551,075 shares outstanding, plus (ii) $664 million, whereas the Debtor's free cash flow was about $927 million. Therefore, according to Blue Ocean, the cash consideration would use up over 2/3 of the Debtor's free cash flow. *See* Amended Petition (Ex. C) ¶¶ 24-27. Stage One of the Transaction included the acquisition of a licence agreement to market a product known as CK0802 in Asia from GM Precision Medicine (BVI) Limited, a subsidiary of Golden Meditech Holdings Limited ("GMHL") for US $664 million in cash and 12,363,636 shares in the Debtor (the "Licence Agreement"). *See* Amended Petition (Ex. C) ¶ 28.

19. Blue Ocean alleges that the Transaction is a related party transaction given a number of close connections between GMHL and the Debtor. In particular, Blue Ocean alleges in the Amended Petition that GMHL was founded by Mr Yuen Kam. Amended Petition (Ex. C) ¶ 3. Ms. Tina Zhen, the Debtor's Chairperson and Executive Director, has a personal relationship with Mr. Kam (they have two children together). Amended Petition (Ex. C) ¶¶ 3.2 and 32.1. In addition, the Amended Petition alleges that Mr. Kam indirectly owns or controls 55.7% of Cellenkos and owned the Licence Agreement, for which he stands to receive US$664 million plus 12.3 million shares in the Debtor. Amended Petition (Ex. C) ¶ 32.1. On April 29, 2022, the date on which the Transaction was first publicly disclosed, the Debtor's stock was trading on the NYSE at $3.51 per share. At the opening of the NYSE on May 3, 2022, the price was $2.16 per share, a 38% reduction. *See* Amended Petition (Ex. C) ¶ 7.

### b. The Winding-Up Petition and Amended Petition

20. On May 5, 2022, Blue Ocean filed the Initial Petition (Ex. B) in the Grand Court, which was subsequently amended by the Amended Petition (Ex. C) filed on September 22, 2022,

7

alleging that, among other things: neither Blue Ocean nor its appointed Director was aware of the potential Transaction until reviewing the Form 6-K filing; no shareholder approval had been sought; the Debtor's Board's approval was rushed and forced and based on insufficient information during an insufficient timeframe of 62 hours; the Transaction involved undisclosed related parties, including GMHL and its directors; and the consideration to be paid by the Debtor was inflated. *See* Amended Petition (Ex. C) ¶¶ 29-52.

21.     Blue Ocean sought the winding-up of the Debtor on grounds that (a) Blue Ocean had justifiably lost all trust and confidence that the assets and affairs of the Debtor were being properly managed; (b) that Blue Ocean believes that there is an urgent need to investigate the Debtor's affairs and conduct in relation to the Transaction, the forgery of the bank statements and the unlawful payments (described in more detail below); (c) that the Debtor and its board are acting in a matter designed to cause oppression and prejudice to Blue Ocean and the Debtor's shareholders; and (d) that the board of the Debtor acted in breach of its fiduciary duties and the NYSE rules in approving the Transaction and failing to put the Transaction to the shareholders at an extraordinary meeting. *See* Amended Petition (Ex. C) ¶ 69. Blue Ocean primarily seeks, in the Amended Petition, "alternative relief" pursuant to section 95(3) of the Cayman Act requesting that the Grand Court either (a) enjoin the Transaction, (b) order the Debtor to amend its Articles of Association to enhance shareholder protections, and (c) compel the Debtor to consider replacing its Board, or (f) order the Debtor to be wound up and appoint joint official liquidators. *See* Amended Petition (Ex. C) ¶ 70.

22.     By *ex parte* summons dated May 9, 2022, Blue Ocean sought and obtained (on May 12, 2022) an *ex parte* injunction restraining the Debtor from, *inter alia*, closing the Transaction or issuing any new shares (the "<u>Injunction Order</u>"). By summons dated May 16, 2022, Blue Ocean

8

sought the continuation of the Injunction Order, and it was amended and varied by consent orders. The Debtor argued at a later hearing that the Injunction Order ought to be set aside as the balance of convenience favored permitting the Debtor to complete a part-performed contract. July 29 Judgment (Ex. D) ¶ 2.

23. In addition, Blue Ocean purported to convene an extraordinary shareholders' meeting (an "EGM") on June 16, 2022 to replace the Debtor's board of directors, which gave rise to two further applications on the Debtor's part. Firstly, by an *ex parte* on notice summons dated June 14, 2022, the Debtor sought to constrain the holding of the EGM, or alternatively to restrain implementation of any resolution purportedly passed at the EGM. The Grand Court granted the alternative relief sought by injunction granted on June 15, 2022 (the "EGM Injunction Order"). July 29 Judgment (Ex. D) ¶ 6. At the EGM on June 16, 2022, resolutions were purportedly passed removing the existing directors and appointing a new slate nominated by shareholders claiming to represent a dissenting majority of more than 75% of the Debtor's shareholders. The Debtor issued a summons dated June 17, 2022, seeking a declaration that the EGM was invalidly convened and that resolutions passed at it were of no effect. *Id*. ¶ 7. Lastly, the Debtor filed a summons on 7 June 2022, seeking that the Grand Court validate the implementation of the Transaction under section 99 of the Cayman Act. *Id*. ¶ 5.

24. In the July 29 Judgment (Ex. D), the Grand Court (a) dismissed the Injunction Order (although, to the best of my knowledge, this is yet to be formalized or "perfected" in an order of the Grand Court, *see* September 28 Judgment (Ex. E) ¶ 20); (b) refused the relief sought by the Debtor in relation to the convening of an EGM by Blue Ocean with leave for the Debtor to apply to renew its application, *see* July 29 Judgment (Ex. D) ¶ 76; (c) continued the EGM Injunction Order, *id*. ¶ 52; and (d) dismissed the Debtor's Validation Summons, *id*. ¶ 71.

25. The July 29 Judgment did not decide the issues in the Amended Petition, which remain to be heard by the Grand Court. However, in the July 29 Judgment, the Grand Court described uncertainty as to the Transaction as follows: "*On any view it is impossible at this stage to discern any easily comprehensible commercial rationale for the [Debtor], especially being a listed company, consummating and implementing an arrangement which was so financially and strategically significant with such a breath-taking combination of speed and stealth, particularly in circumstances where the [Debtor] was (as at April 28, 2022) under 'minority' rather than majority shareholder control.*" July 29 Judgment (Ex. D) ¶ 57. The Grand Court also determined that Blue Ocean had a "*good arguable case for succeeding in establishing that the Transaction was unlawful because it required shareholder approval,*" *id.* ¶ 76(b), and found some of the Debtor's evidence to be "*largely incredible on its face,*" *id.* ¶ 64.

c. **Amendment of the petition: unlawful payments and fraud**

26. Blue Ocean filed the Amended Petition on September 22, 2022 based on new and allegedly unrebutted evidence proving that the Debtor's testimony that the Transaction was partially performed, was fraudulent, and the Debtor's bank statement showing the payment of the $664 million was forged. *See* Amended Petition (Ex. C) ¶¶ 55-56; September 28 Judgment (Ex. E) ¶¶ 6-12.

27. Blue Ocean's Amended Petition also included new allegations that, among other things, the Debtor had paid $500 million to Mr. Kam's companies over five years that was not disclosed in the Debtor's published financial statements. *See* Amended Petition (Ex. C) ¶ 57. I further understand that in submissions to the Grand Court on September 22, 2022, it was alleged that large amounts of funds were taken from the Debtor's subsidiaries and paid to Mr. Kam's companies within four days of Blue Ocean presenting its initial petition on May 5, 2022. Blue

Ocean's evidence as to the forgery of the Debtor's bank documents was not contested in any substantive or serious way by the Debtor. September 28 Judgment (Ex. E) ¶ 19.

### d. The appointment of joint provisional liquidators

28. Blue Ocean filed a summons on August 23, 2022, requesting that the Grand Court appoint joint provisional liquidators pursuant to section 104 of the Companies Act, in part to address the mismanagement or misconduct or dissipation or misuse of assets. *See* September 28 Judgment (Ex. E) at 1 (Headnote) and ¶¶ 19-26.

29. In the September 28 Judgment, the Grand Court granted Blue Ocean's summons for the appointment of joint provisional liquidators, concluding that "it is difficult to imagine a stronger case for appointing provisional liquidators than the present situation." *See* September 28 Judgment (Ex. E) ¶ 27. The Grand Court was of the view that there were "serious doubts" about the Debtor's evidence that monies were paid on April 29, 2022 pursuant to the first stage of the Transaction. *Id.* ¶ 21. The Grand Court was also of the view that there was clearly a "risk of mismanagement flowing from the fact that the best available evidence strongly suggests that the Chief Financial Officer of the Company had misled the Court and put before the Court a false bank statement pivotal to the matters that the Court was adjudicating at the 13-15 July 2022 hearing." *Id.* ¶ 22. The risk of mismanagement also arose from the purportedly independent Directors' "silence, or paralysis" in reaction to the "shocking allegations about forgery." *Id.* ¶ 23; *see also id.* ¶¶ 6-12 and 20-26.[5]

30. Accordingly, on the same day, the Grand Court entered the Order appointing myself and John Royle of Grant Thornton Specialist Services (Cayman) Limited and Chow Tsz Nga

---

[5] The Debtor also commenced a proceeding against Blue Ocean in the British Virgin Islands ("BVI") court, asserting that Blue Ocean lacked standing to protest the Transaction because it had pledged its shares, all of which Blue Ocean disputed. *See* September 28 Judgment (Ex. E) ¶ 9. It is important to note that the Grand Court has held that Blue Ocean had standing as a registered shareholder of the Debtor. *See* September 28 Judgment (Ex. E) ¶¶ 17-18.

Georgia of Grant Thornton Recovery & Reorganisation Limited as the Debtors' JPLs. Order (Ex. A) ¶ 1. The Order also, among other things, authorizes the JPLs to "carry on the business of the [Debtor]" and to seek "recognition of the JPLs and/or their appointment" in any "relevant jurisdiction," and stays any "suit, action, or other proceedings" against the Debtor, except by leave of the Grand Court. Order (Ex. A) ¶¶ 8-14.

31.     Pursuant to the Order, the powers of the Debtor's board of directors are suspended. Order (Ex. A) ¶ 9.

### III.     Center of Main Interests of the Debtor

32.     As noted above, the Debtor is organized under Cayman Islands law and has its registered office in the Cayman Islands.

33.     As noted above, the Debtor is a holding company, whose only business, prior to the commencement of the Cayman Proceeding, was to own its subsidiaries (a number of which are also based, incorporated and have directors based in the Cayman Islands).

34.     Since the JPLs were appointed, pursuant to the Order, we have been directing our legal, forensic, accounting, corporate, and investor outreach activities from the Cayman Islands (with the assistance of our colleague Chow Tsz Nga Georgia, who is based in Hong Kong), under the supervision of the Grand Court.

35.     We are managing all aspects of the Debtor's business, including taking control of the Debtor's subsidiaries, acquiring the Debtor's and its subsidiaries' books and records, examining the Transaction, investigating Debtor's management and related parties more broadly, tracking down the Debtor's funds and other assets, and communicating with the Debtor's stakeholders – all of which activity is primarily based in the Cayman Islands.

36.     Two of the three JPLs (John Royle and I) are residents of the Cayman Islands.

37.     I am not aware of any pending "foreign proceeding" as defined in section 101(23) of the Bankruptcy Code with respect to the Debtor, other than the Cayman Proceeding.

**RELIEF SOUGHT**

38.     The JPLs are seeking this Court's assistance for two main reasons, as our investigation and related efforts continue. First, we need the automatic stay to preserve and prevent from being further dissipated or hidden any funds or other assets of the Debtor that we may discover in the United States. More than a half billion dollars of the Debtor's funds may have been secretly and wrongfully transferred from the Debtor, and it is possible that some of those funds may be in or have passed through the United States. Indeed, Cellenkos, the purported target of the Transaction, is based in Houston. We need control of any Debtor property that we discover in the United States for the same reasons, to preserve it for the benefit of all stakeholders. Second, we need the subpoena power to compel disclosure from persons in the United States who we have reason to believe may have information that will assist us in our investigation of the Transaction with Cellenkos and our pursuit of the Debtor's assets in the United States. In our experience to date in this matter, requests backed by the Order are effective in the Cayman Islands but rarely result in disclosure of information or production of documents from persons in the United States.

### IV.    Verified Petition

39.     In the accompanying Verified Petition, the JPLs respectfully seek entry of an order providing the following relief:

(a)     recognition pursuant to section 1517 of the Bankruptcy Code of the Cayman Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code;

(b)     the relief available pursuant to section 1520(a) and 1520(b) of the Bankruptcy Code, in particular the authority to examine witnesses and take evidence pursuant to section 1520(a)(4); and

    (c)    such other and further relief as is appropriate under the circumstances pursuant to sections 105(a) and 1507 of the Bankruptcy Code.

40. In the event that the Court were to find that the Cayman Proceeding is a non-main foreign proceeding or that the relief sought herein is otherwise not available under section 1520, the JPLs respectfully request the same relief pursuant to sections 1507 and 1521(a)(1)-(2).

### V. Notice Application

41. With this Declaration, the JPLs have filed the Notice Application. Based on my review of the Debtor's records and the JPLs' investigation to date, I believe that service of the notice of the Recognition Hearing in the manner proposed in the Notice Application will provide the Debtor's various parties in interest due and sufficient notice of the Recognition Hearing and objection deadline.

*[remainder of page intentionally left blank]*

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge.

Date:   October 7, 2022
       Grand Cayman, Cayman Islands

_____
Margot MacInnis
*Managing Director*
Grant Thornton Specialist Services
(Cayman) Limited