Daniel J. Saval
John G. Conte
**KOBRE & KIM LLP**
800 Third Avenue
6th Floor
New York, New York 10022
Tel: (212) 488-1200
daniel.saval@kobrekim.com
john.conte@kobrekim.com

*Counsel to Golden Meditech Stem Cells (BVI) Company Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GLOBAL CORD BLOOD CORPORATION,<br><br>Debtor in a Foreign Proceeding.[1] | Chapter 15<br><br>Case No. 22-11347- (DSJ) |

**OBJECTION OF GOLDEN MEDITECH STEM**
**CELLS (BVI) COMPANY LIMITED TO VERIFIED CHAPTER 15 PETITION**
**FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF**

---

[1] As explained herein, notwithstanding the case caption above, Golden Meditech Stem Cells (BVI) Company Limited disputes that Global Cord Blood Corporation is a "debtor" in a "foreign proceeding" under Chapter 15.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 5

A.  Events Leading To Shareholder Dispute Between GMSC And Blue Ocean ..................... 5

B.  Blue Ocean Commences The Cayman Proceeding
    Primarily To Enjoin The Cellenkos Transaction .................................................. 9

C.  Blue Ocean And GMSC Litigate Their Dispute In The British Virgin Islands ................ 11

D.  Blue Ocean Pursues Section 1782 Discovery In The United States
    From Cellenkos To Use In The Cayman Proceeding And BVI Proceeding ...................... 12

ARGUMENT ....................................................................................................... 13

A.  GMSC Has Standing To Object To The Relief Sought
    In The Verified Petition As The Beneficial Owner of Shares In Global Cord ................ 13

B.  The Cayman Proceeding Is Not A "Foreign Proceeding"
    That Qualifies For Chapter 15 Recognition .................................................... 14

    1.  *The Cayman Proceeding Is Not a Collective Proceeding* ............................... 16

    2.  *The Cayman Proceeding Was Commenced On The "Just And Equitable" Ground*
        *Under A Provision Of The Companies Act That Is Unrelated To Insolvency Or The*
        *Adjustment of Debt* ....................................................................... 18

    3.  *The Cayman Proceeding Is Not For*
        *The Purpose Of Reorganization Or Liquidation* ...................................... 25

    4.  *In The Alternative, The Court Should Defer Ruling On*
        *The Verified Petition Until After A Final Decision*
        *On Blue Ocean's Amended Petition in the Cayman Proceeding* ....................... 29

C.  Even if the Cayman Proceeding Is Recognized,
    Discretionary Relief Pursuant Section 1521 Should Be Denied ............................. 30

CONCLUSION ..................................................................................................... 32

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re ABC Learning Centres Ltd.*,
  445 B.R. 318 (Bankr. D. Del. 2010) ........................................................................ 23

*In re ABC Learning Centres Ltd.*,
  728 F.3d 301 (3d Cir. 2013) ................................................................................... 23

*In re AJW Offshore Ltd.*,
  No. 13-70078 (Bankr. E.D.N.Y Feb. 5, 2013) ................................................... 24, 27

*In re Ashapura Minechem Ltd.*,
  No. 11-14668 (JMP), 2011 WL 5855485 (Bankr. S.D.N.Y. Nov. 22, 2011) .......................... 15

*In re Ashapura Minechem Ltd.*,
  480 B.R. 129 (S.D.N.Y. 2012) ............................................................... 15, 16, 17, 18

*In re Basis Yield Alpha Fund (Master)*,
  381 B.R. 37 (Bankr. S.D.N.Y. 2008) ............................................................... 14, 15

*In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*,
  258 B.R. 580 (Bankr. S.D.N.Y. 2001) ...................................................................... 31

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  374 B.R. 122 (Bankr. S.D.N.Y 2007) ....................................................................... 15

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
  389 B.R. 325 (S.D.N.Y. 2008) .............................................................................. 14

*In re Betcorp Ltd.*,
  400 B.R. 266 (Bankr. D. Nev. 2009) ....................................................................... 23

*In re British Am. Ins. Co. Ltd.*,
  425 B.R. 884 (Bankr. S.D. Fla. 2010) ................................................................ 16, 25

*In re Condor Ins. Ltd.*,
  601 F.3d 319 ............................................................................................... 20

*In re ENNIA Caribe Holding N.V.*,
  594 B.R. 631 (Bankr. S.D.N.Y. 2018) ...................................................................... 15

*In re Fairfield Sentry Ltd.*,
  714 F.3d 127 (2d Cir. 2013) ............................................................................... 19

*In re Gold & Honey, Ltd.*,
   410 B.R. 357 (Bankr. E.D.N.Y. 2009) ................................................................. 16

*In re Int'l Banking Corp. B.S.C.*,
   439 B.R. 614 (Bankr. S.D.N.Y. 2010)................................................................... 30

*In re Irish Bank Resolution Corp. Ltd.*,
   No. 13-12159 (CSS), 2014 WL 9953792 (Bankr. D. Del. Apr. 30, 2014).............. 16

*In re Johns–Manville Corp.*,
   36 B.R. 743 (Bankr. S.D.N.Y. 1984).................................................................... 13

*In re LDK Solar Co., Ltd.*,
   No. 14-12387 (PJW) (DE No. 5) (Bankr. D. Del. Nov. 21, 2014) ..................... 24, 27

*In re Luckin Coffee Inc*,
   No. 21-10228 (MG) (Bankr. S.D.N.Y. Feb. 5, 2021) ....................................... 24, 27

*In re Millard*,
   501 B.R. 644 (Bankr. S.D.N.Y. 2013).................................................................. 24

*In re Ocean Rig UDW Inc.*,
   570 B.R. 687 (Bankr. S.D.N.Y. 2017)............................................................ 14, 24, 27

*In re Oversight & Control Comm'n of Avanzit, S.A.*,
   385 B.R. 525 (Bankr. S.D.N.Y. 2008).................................................................. 29

*In re Platinum Partners Value Arbitrage Intermediate Fund Ltd.*,
   No. 17-12269 (SCC) (Bankr. S.D.N.Y Aug. 17, 2017) .................................... 24, 27

*In re PT Bakrie Telecom Tbk*,
   628 B.R. 859 (Bankr. S.D.N.Y. 2021)................................................................... 17

*In re RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*,
   349 B.R. 333 (S.D.N.Y. 2006) ............................................................................. 20

*In re Saad Invs. Fin. Co. (No.5)*,
   No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) ........................................ 24, 27

*In re Stone Barn Manhattan LLC*,
   405 B.R. 68 (Bankr. S.D.N.Y. 2009).................................................................... 13

*In re Suntech Power Holdings Co., Ltd.*,
   No. 14-1038 (SMB) (Bankr. S.D.N.Y Feb. 21, 2014) ...................................... 24, 27

## Statutes

11 U.S.C. § 101(23) ................................................................. 1, 2, 15, 18, 22, 24, 25

11 U.S.C. § 101(24) ................................................................................. 22, 29

11 U.S.C. § 1501 ............................................................................................ 28

11 U.S.C. § 1502 ................................................................................... 1, 14, 15

11 U.S.C. § 1508 ............................................................................................ 19

11 U.S.C. § 1515 ............................................................................................ 29

11 U.S.C. § 1517 ................................................................................. 14, 15, 29

11 U.S.C. § 1521 ........................................................................................ 4, 30

11 U.S.C. § 1522 ........................................................................................ 4, 30

28 U.S.C. § 1782 .................................................................................... Passim

## Rules

Fed. R. Bankr. P. 1012(a) .............................................................................. 13

## Other Authorities

Cayman Islands Companies Act (2021 Revision) ................................... Passim

Cayman Islands Companies Act § 92 (2021 Revision) ...................... 3, 10, 19

Cayman Islands Companies Act § 95 (2021 Revision) ........................ 10, 16

Cayman Islands Companies Act § 104(2) (2021 Revision) ............... 11, 26, 27

House Judiciary Committee, H.R. Rep. No. 109-31 (2005) ................... 20, 22

UNCITRAL, *Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation* (Jan. 2014) .................................................................. Passim

UNCITRAL, *Report of the Working Group on Insolvency Law on the Work of Its Fortieth Session* (Nov. 21, 2011) ............................................................................ 20

UNCITRAL, *Report of the Working Group on Insolvency Law on the Work of Its Forty-Third Session* (Apr. 26, 2013) ........................................................................................................... 21

**Other Jurisdictions**

*In Re Joint Liquidators of Supreme Tycoon Ltd,*
    [2018] HKCFI 277; [2018] 1 HKLRD 1120 ........................................................................... 23

*Re Stanford International Bank Ltd (In Receivership),*
    [2011] Ch. 33 ...................................................................................................................... 18

*Re Bailey and another (Sturgeon Central Asia Balanced Fund Ltd.),*
    [2020] EWHC 123 (Ch) ........................................................................................................ 22

Golden Meditech Stem Cells (BVI) Company Limited ("**GMSC**"), by and through its undersigned counsel, hereby submits this objection (the "**Objection**") to the *Verified Chapter 15 Petition for Recognition of Foreign Proceeding and Related Relief* [Docket No. 2] (the "**Verified Petition**").[2]   In support of the Objection, GMSC submits (i) the *Declaration of Mohammed Jalil Asif K.C. in Support of Objection of Golden Meditech Stem Cells (BVI) Company Limited to Verified Chapter 15 Petition* (the "**Asif Declaration**"), and (ii) the *Declaration of John G. Conte in Support of Objection of Golden Meditech Stem Cells (BVI) Company Limited to Chapter 15 Petition* (the "**Conte Declaration**"), each filed contemporaneously herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The Cayman Proceeding cannot be recognized under Chapter 15 because it does not qualify as a "foreign proceeding" that is eligible for recognition.  The Cayman Proceeding is but one salvo in a multijurisdictional dispute between GMSC and Blue Ocean over which entity owns and controls the majority of the shares of Global Cord Blood Corporation ("**Global Cord**"),[4] and therefore which entity has the right to determine whether Global Cord proceeds with a corporate acquisition of Cellenkos.  That dispute is centered in the British Virgin Islands ("**BVI**"), where GMSC and Blue Ocean are litigating whether GMSC will be reinstated as a registered shareholder based on Blue Ocean's breaches of agreements with GMSC.

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in the Verified Petition.

[3] Capitalized terms used in the Preliminary Statement but not defined shall have the meanings ascribed to such terms later in the Objection or the Verified Petition, as applicable.

[4] In this Objection, Global Cord Blood Corporation is referred to as "Global Cord" rather than the "Debtor" because it is not a "debtor" under Chapter 15 of the Bankruptcy Code.  Section 1502 defines "debtor" as "any entity that is the subject of a foreign proceeding."  11 U.S.C. § 1502(1). Because, as explained herein, the Cayman Proceeding is not a "foreign proceeding" as defined in 11 U.S.C. § 101(23), it follows that Global Cord is not a "debtor" in this Chapter 15 case.

2.      Blue Ocean did not initiate the Cayman Proceeding because Global Cord is insolvent or facing financial distress—and no party disputes that Global Cord is solvent.  Rather, the primary relief Blue Ocean seeks in the Cayman Proceeding is to enjoin the Cellenkos Transaction.  This doesn't come close to resembling the type of collective insolvency proceeding required for Chapter 15 recognition.  What's more, if GMSC prevails in the BVI litigation, Blue Ocean will no longer be a shareholder of Global Cord and will automatically lose standing to pursue its petition before the Cayman Court.  And Blue Ocean did not even have the authority to commence the Cayman Proceeding, as a June 2018 debt confirmation agreement requires the consent from a GMSC affiliate to authorize such action.

3.      That said, this Court need not wade into all the issues surrounding the disputes between Blue Ocean and GMSC.  The question here is whether the JPLs have satisfied the strict and rigid requirements for Chapter 15 recognition.  They have not.  To be eligible for recognition, the foreign proceeding must be "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation."[5]  The Cayman Proceeding is not a recognizable "foreign proceeding" for at least three reasons.

4.      *First*, the Cayman Proceeding is not a "collective proceeding" because it was commenced by Blue Ocean for the primary purpose of enjoining the Cellenkos Transaction.  The Cayman Court has not entered a "winding up" order or empowered the JPLs to liquidate Global Cord's assets or administer creditor claims.  In fact, Blue Ocean has only sought the remedy of a winding up order as *alternative* relief.  Additionally, creditors have not been given notice of, and

---

[5] 11 U.S.C. § 101(23) (definition of "foreign proceeding").

have no ability to participate in, the Cayman Proceeding, which is essentially a two-party dispute between Blue Ocean and Global Cord. Accordingly, the appointment of the JPLs more closely resembles an interim receivership for the benefit of one party—namely Blue Ocean—rather than a collective insolvency process for the benefit of all creditors and other stakeholders.

5.      *Second*, the Cayman Proceeding was not authorized "under a law relating to insolvency or the adjustment of debt." The Cayman Proceeding was commenced under the "just and equitable" ground of Section 92(e) of the Cayman Islands Companies Act, rather than under Section 92(d), a separate statutory provision that applies to the winding up of a company that cannot pay its debts. The Enactment Guide to the UNCITRAL Model Law on Cross-Border Insolvency (the "**Model Law**") and related materials make clear that only proceedings involving debtors that are *insolvent* or facing *severe financial distress* should qualify as a "foreign proceeding." Solvent winding up proceedings commenced on "just and equitable" grounds by a shareholder are not a "foreign proceeding" under the Model Law.

6.      *Third*, the Cayman Proceeding is not for the "purpose of reorganization or liquidation" of Global Cord. As mentioned, the primary aim of the proceeding is to enjoin the Cellenkos Transaction for the benefit of Blue Ocean. The Verified Petition completely glosses over this requirement, merely stating that "the proceedings (unless dismissed) are *expected* to result in the reorganization or liquidation of the Debtor."[6] (emphasis added). But right now, the JPLs have no authority to liquidate or reorganize Global Cord, and the Cayman Court has not entered any order winding up Global Cord. And if Blue Ocean gets what it asks for, a liquidation or reorganization of Global Cord will *never* happen in the Cayman Proceeding. This is because Blue Ocean primarily seeks an order—under a provision of the Cayman Island Companies Act

---

[6] Verified Petition, ¶ 25.

designed to remedy shareholder grievances—to enjoin the Cellenkos Transaction and require amendments to Global Cord's corporate charter styled as "shareholder protection provisions." Blue Ocean only requests that Global Cord be wound up *in the alternative*, which is a *remedy of last resort* in a just and equitable proceeding.  Given that the Cayman Court must exercise its discretion as to the most appropriate relief based on the facts at the time of the final hearing on Blue Ocean's Amended Petition, the JPLs are not in a position to credibly say what remedy the Cayman Court is *expected* to grant, particularly when there is no imminent date for the final hearing on the Amended Petition.

7.    Even if this Court grants recognition, the discretionary relief sought by the JPLs under Section 1521 should be denied.  The Verified Petition fails to explain why that discretionary relief is necessary or appropriate in light of Section 1521(a)'s requirement that such relief be "necessary to effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of creditors"[7] and Section 1522(a)'s requirement that GMSC's interests be "sufficiently protected."[8]  Moreover, as part of their request for discretionary relief, the JPLs seek subpoena power to compel disclosure of information related to the Cellenkos Transaction that could be used in litigation against GMSC abroad.  The JPLs do not even attempt to explain why such relief is appropriate, particularly in light of the fact that Blue Ocean has *separately sought the power to issue subpoenas for information regarding the Cellenkos Transaction*, in proceedings brought under 28 U.S.C. § 1782 in the U.S. District Court for the Southern District of Texas.  The JPLs failed to even advise this Court that Blue Ocean is pursuing such relief, even though they were

---

[7] *See* 11 U.S.C. § 1521(a).
[8] *See* 11 U.S.C. § 1522(a).

aware of this when they filed the Verified Petition and appear to be actively assisting Blue Ocean in the Texas 1782 Proceeding.

8.      For the above reasons, and as more fully explained below, the Court should deny all the relief sought in the Verified Petition.  At a minimum, given the uncertainty hanging over the Cayman Proceeding and Blue Ocean's rights to maintain and prosecute that proceeding, the Court should decline to rule on the Verified Petition until a final decision on Blue Ocean's Amended Petition has been rendered by the Cayman Court.  The JPLs have not identified any exigent circumstances that require prompt adjudication of the Verified Petition—and there are none.

## STATEMENT OF FACTS

**A.      Events Leading To Shareholder Dispute Between GMSC And Blue Ocean**[9]

9.      GMSC is an entity indirectly owned by Kam Yuen ("**Mr. Kam**"), a Hong Kong businessman who served as the chairperson and director of Global Cord until January 30, 2018. GMSC's dispute with Blue Ocean stems back to 2014, when Mr. Kam met Yuan Yafei ("**Mr. Yuan**"), another businessman who controlled two Chinese companies listed on the Shanghai Stock Exchange.  At the time, Mr. Kam wanted to privatize Global Cord and re-list it in China.  The two realized that they could further their business interests through a merger, and Mr. Yuan formed an entity called Nanjing Ying Peng Hui Kang Medical Industry Investment Partnership (Limited Partnership) ("**Nanjing Ying Peng**") for the purpose of acquiring Mr. Kam's interest in Global

---

[9] While many (if not most) of the facts surrounding the disputes between GMSC and Blue Ocean are not germane to whether the Cayman Proceeding should be recognized under Chapter 15, GMSC believes the Court may find background regarding the disputes helpful for context.

Cord, which Mr. Kam held through GMSC.  Mr. Yuan is the controlling shareholder of Sanpower Group Co., Ltd. ("**Sanpower Group**"), which in turn controls Nanjing Ying Peng.

10.     In December 2016, GMSC and Nanjing Ying Peng entered into a Sale and Purchase Agreement (the "**2016 Share Purchase Agreement**"), pursuant to which GMSC agreed to sell 65.4% of the shares of Global Cord to Nanjing Ying Peng for RMB 5.764 billion (approximately US$800 million) (the "**Share Sale**").  Nanjing Ying Peng funded the cash consideration for the Share Sale into an escrow account pending closing.  Prior to the closing, Nanjing Ying Peng had control over the funds in the escrow account.  In June 2017, Nanjing Ying Peng, at the request of Mr. Yuan, consented to withdrawals totaling approximately RMB 3.5 billion from the escrow account to a shell company he used as a vehicle to misappropriate funds.

11.     Shortly after these transfers, GMSC issued a notice requesting to close the Share Sale; however, Nanjing Ying Peng was unable to do so because there were insufficient funds in the escrow account due to Mr. Yuan's misappropriation.  GMSC agreed to extend the closing date, but Mr. Yuan was ultimately unable to close because Sanpower Group began experiencing liquidity issues in late 2017.

12.     After months of discussion, Mr. Yuan returned approximately RMB 1.2 billion to the escrow account, which was transferred to an affiliate of GMSC as partial consideration for the Share Sale.  In total, however, Nanjing Ying Peng had only paid approximately RMB 3.825 billion of the approximately RMB 5.764 billion purchase price and other amounts it was required to pay under the 2016 Share Purchase Agreement.

13.     To facilitate the closing of the Share Sale, Sanpower Group executed a loan agreement with Golden Meditech Holdings Limited ("**GMHL**"), an affiliate of GMSC, on January 31, 2018 ("**January 2018 Loan Agreement**") in the amount of approximately RMB 2.002 billion,

the then-outstanding consideration for the Share Sale.  The January 2018 Loan Agreement evidenced Nanjing Ying Peng's existing outstanding payments under the 2016 Share Purchase Agreement.  As security for the obligations under the January 2018 Loan Agreement, Sanpower Group agreed to charge its general partner and limited partner interests in Nanjing Ying Peng in favor of GMHL.  GMSC then transferred its shares in Global Cord to Blue Ocean Structure Investment Company Ltd ("**Blue Ocean**") because Nanjing Ying Peng was under internal pressure to complete the Share Sale by the end of January 2018.  Blue Ocean is in turn owned by Blue Ocean Creation Investment Hong Kong Limited ("**Blue Ocean HK**").

14.     Sanpower Group, however, failed to pay its obligations under the January 2018 Loan Agreement.  After several meetings, the parties agreed to enter into further agreements to extend repayment terms.  Accordingly, on March 29 and March 30, 2018, GMHL entered into two loan agreements with Nanjing Ying Peng and Sanpower Group to evidence outstanding indebtedness of approximately RMB 2.337 billion (including interest) (collectively, the "**March 2018 Loan Agreements**").  As security for the obligations under the March 2018 Loan Agreements, (i) Blue Ocean HK (as chargor) and GMSC (as chargee) entered into a Share Charge Agreement, dated March 30, 2018 (the "**BVI Share Charge Agreement**"), pursuant to which Blue Ocean HK charged its interest in all shares it beneficially owned in Blue Ocean (the "**BVI Share Charge**") for the benefit of GMSC, and (ii) Blue Ocean (as chargor) and GMSC (as chargee) entered into a Share Charge Agreement, dated March 30, 2018 (the "**Cayman Share Charge Agreement**" [10] and together with the BVI Share Charge Agreement, the "**Share Charge Agreements**"), pursuant to which Blue Ocean agreed to charge its interest in all shares it

---

[10] The Cayman Share Charge Agreement is annexed to the Conte Declaration as **Exhibit A**.

beneficially owned in Global Cord for the benefit of GMSC (the "**Cayman Share Charge**" and together with the BVI Share Charge, the "**Share Charges**").

15.    Ultimately, neither Sanpower Group nor Nanjing Ying Peng paid their obligations under the March 2018 Loan Agreements.  On June 26, 2018, Sanpower Group, Sanpower Group Nanjing Investment Management Co Ltd, Nanjing Ying Peng Asset Management Co., Ltd ("**Ying Peng AMC**") (Nanjing Ying Peng's managing general partner), and Mr. Yuan entered into a Debt Confirmation Agreement (the "**2018 Debt Confirmation Agreement**") with Golden Meditech Shanghai (Shanghai) Company Ltd ("**GMSCL**"), an affiliate of GMSC also controlled by Mr. Kam.  *See* Conte Decl. Ex. L-1 (2018 Debt Confirmation Agreement), L-2 (Translation).  Under the 2018 Debt Confirmation Agreement, in recognition of the outstanding amounts owed by Nanjing Ying Peng (with interest and penalties thereon), Sanpower Group confirmed that it was indebted in the total amount of RMB 3 billion and that Mr. Yuan and certain of his affiliates agreed to guarantee the loan obligations and provided share charges of shares of those affiliates.

16.    In addition, the 2018 Debt Confirmation Agreement contained several covenants related to exercising control over Global Cord, including that: (1) Ying Peng AMC must obey instructions from GMSCL when it exercises any powers and rights in Nanjing Ying Peng; (2) Nanjing Ying Peng and its subsidiaries must exercise its shareholder rights in Global Cord as instructed by GMSCL; and (3) Sanpower Group, Ying Peng AMC, and Mr. Yuan must ensure their nominated directors vote as requested by GMSCL.  Two directors of Blue Ocean, Mr. Xu Ping and Mr. Chen Xiaoyang, also signed individual confirmation letters acknowledging the 2018 Debt Confirmation Agreement.  *See* Conte Decl. Ex. L-3 (Mr. Ping's Confirmation), L-4 (Translation), L-7 (Mr. Xiaoyang's Confirmation), L-8 (Translation).

17.     Once again, neither Sanpower Group, Nanjing Ying Peng, nor the entities Mr. Yuan controlled made any payments under the 2018 Debt Confirmation Agreement.  Sanpower Group was taken over by a Financial Creditors' Committee led by Jiangsu Provincial Government of China in September 2018.

18.     On October 21, 2020, GMSC filed a Stop Notice to enforce its beneficial entitlement to the shares of Blue Ocean that had been assigned to GMSC under the BVI Share Charge Agreement.

19.     On May 23, 2022, GMSC made a Schedule 13D SEC filing disclosing that it held a charge over Blue Ocean's shares in Global Cord pursuant to the Cayman Share Charge Agreement.  *See* Conte Decl. Ex. B.

**B.     Blue Ocean Commences The Cayman Proceeding Primarily To Enjoin The Cellenkos Transaction**

20.     On May 5, 2022, Blue Ocean commenced a proceeding (the "**Cayman Proceeding**") in the Grand Court of the Cayman Islands, Financial Services Division (the "**Cayman Court**") under the Cayman Islands Companies Act (2021 Revision) (the "**Companies Act**").  *See* MacInnis Decl. ¶ 16.  GMSC maintains that Blue Ocean did not have authority to commence the Cayman Proceeding because its interest in Global Cord's shares had been assigned to GMSC under the Cayman Share Charge Agreement, and that Blue Ocean is in breach of the terms of the 2018 Debt Confirmation Agreement because the Cayman Proceeding was not authorized by GMSCL.

21.     The primary purpose of the Cayman Proceeding is to challenge the authorization of, and enjoin, a transaction by which Global Cord is to acquire the shares of Cellenkos, Inc. ("**Cellenkos**") through various stock purchase agreements with Cellenkos' shareholders (such transaction, the "**Cellenkos Transaction**").  *Id.* at ¶ 21.  Blue Ocean also seeks an order directing

Global Cord to amend and restate its Memorandum and Articles of Association to provide for certain "shareholder protections," and to convene an extraordinary general shareholder meeting to remove its directors. *Id*. In the alternative, Blue Ocean seeks to wind up Global Cord and for the appointment of official liquidators, among other things. *Id*.

22.    Notably, the Cayman Proceeding was commenced on the "just and equitable" ground under Section 92(e) of the Companies Act, rather than under Section 92(d) of the Companies Act, a separate statutory provision that applies to an insolvent or financially distressed company that "is unable to pay its debts." *See* Asif Decl. ¶¶ 29, 51. Blue Ocean's petition does not allege that Global Cord is insolvent or facing financial distress, and it can be inferred that Global Cord is solvent because, under Cayman Islands, a shareholder is only able to commence a just and equitable proceeding for a solvent company. *Id*. at ¶¶ 30, 47. Moreover, the primary relief Blue Ocean seeks is pursuant to Section 95(3), a provision of the Companies Act designed to remedy shareholder oppression rather than a provision that can be engaged if a company is insolvent or in financial distress. *Id*. at ¶¶ 34-36, 52.

23.    On September 22, 2022, Blue Ocean filed an amended petition in the Cayman Proceeding (the "**Amended Petition**"). *See* MacInnis Decl. Ex. C (Amended Petition). The amendments appear to reflect Blue Ocean's revised understanding of purported facts and matters that it says are relevant to the relief that it seeks from the Cayman Court. The relief sought in the Amended Petition is substantively the same as that sought in the initial petition. Specifically, the Amended Petition primarily seeks to obtain orders (a) that Global Cord refrain from proceeding with the Cellenkos Transaction, (b) requiring Global Cord to amend and restate its Memorandum and Articles of Association, and (c) requiring Global Cord to convene an extraordinary shareholder

meeting to propose the removal of the current Board and the appointment of alternative Board members to be proposed by Blue Ocean. *Id.*

24.    Contemporaneously therewith, the Cayman Court entered an order appointing the JPLs, a copy of which is annexed to the Verified Petition as <u>Exhibit A</u> (the "**JPL Appointment Order**"). The JPL Appointment Order appointed the JPLs pursuant to Section 104(2) of the Companies Act based on reasons unrelated to insolvency or the adjustment of debt. *See* Asif Decl. ¶ 54. This is in contrast to an appointment that can be made under Section 104(3), which provides grounds for the appointment of provisional liquidators over companies that are, or are likely to become, unable to pay their debts and where the company is intending to present a compromise or arrangement to its creditors. *Id.* at ¶ 42-44. The JPL Appointment Order authorizes the JPLs to, among other things, preserve Global Cord's assets and investigate and report on the affairs of Global Cord. *See* JPL Appointment Order ¶¶ 4, 5. The JPL Appointment Order does not authorize the JPLs to liquidate or reorganize Global Cord, and the Cayman Court has not entered a "winding up" order directing Global Cord to be liquidated or reorganized in any fashion. *See* Asif Dec. ¶¶ 22-23.

25.    GMSC is evaluating challenges to the JPL Appointment Order on grounds that Blue Ocean did not have authority to commence the Cayman Proceeding. However, the Cayman Court has noted that issues related to Blue Ocean's standing are properly before the BVI Court.[11] Accordingly, GMSC has focused its litigation efforts in the BVI, as discussed below.

C.    **Blue Ocean And GMSC Litigate Their Dispute In The British Virgin Islands**

26.    On May 20, 2022, Blue Ocean commenced a proceeding (the "**BVI Proceeding**") in the High Court of the British Virgin Islands (the "**BVI Court**") alleging, among other things,

---

[11] *See e.g.*, MacInnis Decl. Ex. D (July 29, 2022 Judgment at ¶ 11) ("The validity of the Share Charge issue I accept is properly before the BVI Court….").

that the signatures to the March 2018 Loan Agreements and the Share Charge Agreements were forged and that these agreements are invalid.[12]

27.    On June 17, 2022, GMSC filed its defense and counterclaims denying the allegations made by Blue Ocean. GMSC seeks, among other things: (i) declarations from the BVI Court that the Share Charges are valid and enforceable; (ii) orders from the BVI Court directing Blue Ocean to deliver all share certificates representing the shares in Blue Ocean and Global Cord assigned to it under the Share Charge Agreements; and (iii) an order granting certain other relief from the BVI Court placing restrictions on Blue Ocean's ability to exercise control over Global Cord. GMSC anticipates bringing new claims in the BVI related to Blue Ocean commencing the Cayman Proceeding, which breached the terms of the 2018 Debt Confirmation Agreement, and has notified the JPLs accordingly. *See* Conte Decl. Ex. L.

28.    As of the date hereof, the BVI Court has not ruled on the claims and counterclaims filed in the BVI Proceeding. The next hearing in the BVI Proceeding is scheduled in March 2023.

**D.    Blue Ocean Pursues Section 1782 Discovery In The United States From Cellenkos To Use In The Cayman And BVI Proceedings**

29.    On July 12, 2022, Blue Ocean filed an application with the United States District Court for the Southern District of Texas seeking judicial assistance pursuant to 28 U.S.C. § 1782 (the "**Texas 1782 Proceeding**"). *See* Conte Decl. Ex. D. Specifically, Blue Ocean sought the appointment of a commissioner to issue subpoenas to Cellenkos and certain other related parties to produce documents related to the Cellenkos Transaction for use in the Cayman Proceeding and the BVI Proceeding. *Id*.

30.    On July 20, 2022, the District Court entered an Order (the "**1782 Order**") granting Blue Ocean's 1782 application. *See* Conte Decl. Ex. E.

---

[12] GMSC will make copies of pleadings filed in the BVI Proceeding available upon request.

31.     On September 8, 2022, Cellenkos and the other respondents filed a Motion to

Vacate the 1782 Order (the "**Motion to Vacate**").  *See* Conte Decl. Ex. F.  The Motion to Vacate

focuses on Blue Ocean's disputed status as a shareholder and the fact that Blue Ocean is seeking

overly broad discovery against Cellenkos.  *Id*.

32.     On October 28, 2022, Blue Ocean filed a Sur-Reply to the Motion to Vacate that

included a supporting affidavit from Margot MacInnis in her capacity as a joint provisional

liquidator of Global Cord.  *See* Conte Decl. Ex. H.  Despite this, the Verified Petition fails to even

mention the existence of the Texas 1782 Proceeding or reference the JPLs' apparent role in

assisting Blue Ocean in that proceeding.

## **ARGUMENT**

### A.     **GMSC Has Standing To Object To The Relief Sought In The Verified Petition As The Beneficial Owner Of Shares In Global Cord**

33.     Given the pending shareholder dispute between GMSC and Blue Ocean, GMSC

anticipates that the JPLs may argue that GMSC lacks standing to object to the Verified Petition.

If such an argument is made, it should be rejected.

34.     As a general matter, "[t]he debtor or any party in interest may contest a petition for

recognition of a foreign proceeding."  Fed. R. Bankr. P. 1012(a).  Although the term "party in

interest" is not defined in the Bankruptcy Code, courts construe its meaning broadly "to insure fair

representation of all constituencies impacted in any significant way by a [bankruptcy case]."  *In re*

*Johns–Manville Corp.*, 36 B.R. 743, 754 (Bankr.S.D.N.Y. 1984).  It is generally understood that

"a pecuniary interest ... directly affected by the bankruptcy proceeding provides standing."  *In re*

*Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) (quotations omitted).

35.     GMSC has party in interest standing as the beneficial owner of shares of Global

Cord.  Specifically, Blue Ocean assigned GMSC "all its rights, present and future, actual and

contingent, relating to any of the Charged Property" (*i.e.*, its shares of Global Cord) under the Cayman Share Charge Agreement. *See* Cayman Share Charge Agmt. ¶ 5.1, (Conte Decl. Ex. A). The Cayman Share Charge became immediately enforceable upon non-payment of the obligations under the March 2018 Loan Agreements. *Id.* at ¶ 8.1. Thus, GMSC has a beneficial interest in Global Cord and, if GMSC is successful in the BVI Proceeding, it will receive share certificates and become a shareholder of record. Moreover, GMSC's rights may be affected by recognition because the JPLs have indicated that they may use this Chapter 15 proceeding to obtain information that could be used against GMSC in the Cayman Proceeding and the BVI Proceeding or to otherwise disrupt the Cellenkos Transaction.

36.    In all events, regardless of GMSC's standing, the Court should consider the arguments raised in the Objection because it has an independent obligation to determine whether recognition is proper. *See In re Ocean Rig UDW Inc.*, 570 B.R. 687, 692 (Bankr. S.D.N.Y. 2017) ("Because this Court nevertheless must find that the JPLs have established that recognition is proper in order to grant the recognition motion, the Court will treat Wiener's Objection as if she had established her standing to object to recognition and rule on her arguments on the merits.").

**B.    The Cayman Proceeding Is Not A "Foreign Proceeding" That Qualifies For Chapter 15 Recognition**

37.    Recognition under Section 1517 of the Bankruptcy Code is not a "rubber stamp exercise." *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 40 (Bankr. S.D.N.Y. 2008). To the contrary, the "recognition regime under chapter 15 is procedurally quite rigid." *Id.* at 46; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. 325, 333 (S.D.N.Y. 2008) ("Recognition turns on the strict application of objective criteria."). The Court "must make an independent determination as to whether the [foreign proceeding] meets the definitional requirements of Sections 1502 and 1517 of the Bankruptcy Code, but 'the

determination is a formulaic one.'" *In re Ashapura Minechem Ltd.*, No. 11-14668 (JMP), 2011
WL 5855485, at *4 (Bankr. S.D.N.Y. Nov. 22, 2011) (quoting *Bear Stearns*, 374 B.R. at 126).
The foreign representative bears the burden of proof of each required element for recognition. *See*
*Basis Yield Alpha Fund*, 381 B.R. at 52.

       38.     Chapter 15 recognition is only available for a "foreign main proceeding" or a
"foreign nonmain proceeding." *See* 11 U.S.C. § 1517(a)(1). Both a foreign main proceeding and
a foreign nonmain proceeding require the existence of a "foreign proceeding,"[13] defined as:

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by a foreign
> court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

       In order to establish that the Cayman Proceeding is a "foreign proceeding," the JPLs carry
the burden of proving each of the following seven criteria: "(i) [the existence of] a proceeding;
(ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign
country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of
debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a
foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation." *In
re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012); *In re ENNIA Caribe Holding
N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018). If the JPLs fail to meet their burden of proof on
any one of these seven "definitional elements," then the Cayman Proceeding is not a "foreign
proceeding" within the meaning of Chapter 15. *Id.*

---

[13] 11 U.S.C. § 1502(4), (5).

39.     The JPLs fall far short of establishing that the Cayman Proceeding meets the strict requirements of a "foreign proceeding" under the Bankruptcy Code. Indeed, the Verified Petition barely pays lip service to this requirement, merely stating that the Cayman Proceeding "is plainly one such 'foreign proceeding'" based on only a handful of conclusory statements in the Fox Declaration that provide no support or reasoning. *See* Verified Petition ¶¶ 24-5.[14] However, as explained below, the Cayman Proceeding fails at least three of the definitional elements: (1) it is not a collective proceeding; (2) it is not authorized under a law related to insolvency or the adjustment of debt; and (3) it is not for the purpose of reorganization or liquidation.

### *1.   The Cayman Proceeding Is Not a Collective Proceeding*

40.     The hallmark of a collective proceeding is "whether *all* creditors' interests [are] considered in the proceeding." *Ashapura*, 480 B.R. at 140 (S.D.N.Y. 2012) (emphasis in original); *In re British Am. Ins. Co. Ltd..*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010) (a foreign proceeding "must be instituted for the benefit of all creditors generally rather than for a single creditor or class of creditors."). "This is in contrast, for example, to a receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *In re Irish Bank Resolution Corp. Ltd.*, No. 13-12159 (CSS), 2014 WL 9953792, at *14 (Bankr. D. Del. Apr. 30, 2014); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 370 (Bankr. E.D.N.Y. 2009) (finding Israeli receivership proceeding was not

---

[14] The Fox Declaration states in conclusory fashion that: "[b]ased on the advice I have received, I believe that the Cayman Proceeding satisfies this definition: it is a collective judicial proceeding in the Cayman Islands; the appointment of a Provisional Liquidator is an interim process within that judicial proceeding; the appointment is made under Part V of the Companies Act which is a law relating to the insolvency or adjustment of a debt and the affairs of the Debtor are subject to the supervision of the Grand Court. At this stage in the provisional liquidation the assets and affairs of the Debtor are subject to supervision by the Grand Court on the terms set in the Order, which proceedings (unless dismissed) are expected to result in the reorganization or liquidation of the Debtor, or, where the threshold for an official liquidation is reached, various minority protections under 95(3) Companies Act may be ordered, based on the results of the JPLs' pending investigation and other activities." Fox Decl. ¶ 33.

collective in nature because it was primarily designed to benefit a single secured creditor). "All creditors also must receive notice and be able to protect their rights for a foreign proceeding to be collective." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 873 (Bankr. S.D.N.Y. 2021). "Other characteristics of a collective proceeding include: . . . provisions for the distribution of assets according to statutory priorities, and a statutory mechanism for creditors to seek court review of the proceeding." *Ashapura*, 480 B.R. at 137.

41.     The Cayman Proceeding does not satisfy the criteria for a collective proceeding. The Cayman Proceeding was commenced to benefit Blue Ocean, as claimed shareholder, rather than to benefit creditors generally or to achieve a restructuring for all stakeholders. Indeed, the primary relief sought by Blue Ocean in the Cayman Proceeding is made under a statutory provision of the Companies Act that deals with remedying shareholder oppression. *See* Asif Decl. ¶¶ 34-36, 52. Blue Ocean only seeks to wind up Global Cord and appoint official liquidators *as alternative relief* if its primary plan to thwart the Cellenkos Transaction fails. *See* Verified Petition ¶ 14; JPL Appointment Order ¶ 45.1-45.9. The fact that the JPLs are apparently assisting Blue Ocean's efforts to obtain U.S. discovery for use in the Cayman Proceeding—through the Texas 1782 Proceeding—further underscores that the Cayman Proceeding is primarily designed to serve Blue Ocean's self-interest.

42.     Moreover, the interests of creditors are not being considered in the Cayman Proceeding. The Cayman Court has not entered a "winding up" order authorizing Global Cord to be liquidated and the JPL Appointment Order merely empowers the JPLs to preserve and prevent dissipation of assets and investigate Global Cord's affairs. *See* Asif Decl. ¶ 49. Significantly, the JPLs are not authorized to liquidate Global Cord's assets or to effect a distribution of assets to stakeholders in accordance with any statutory regime. *Id.* Because the Cayman Proceeding was

not initiated by a creditor petition and no liquidation or winding up has been authorized, *creditors have not received notice of the proceeding and have no standing to participate in the proceeding. Id.* at ¶ 46-48.  Further, given that Global Cord is indisputably solvent, the JPLs may *owe no fiduciary duties to creditors*.[15]

43.    The Cayman Proceeding is simply not designed to benefit creditors and is instead being used to aid Blue Ocean in its shareholder dispute with GMSC.  *Id.* at ¶ 58.  It is therefore not a collective proceeding.  The appointment of the JPLs is more akin to a receivership for the benefit of a shareholder that is not eligible for recognition.  *See Re Stanford International Bank Ltd (In Receivership)* [2011] Ch. 33 (English Court finding that appointment of SEC receiver in proceedings relating to securities fraud was not a foreign proceeding "because it is for the protection of investors not the wider class of creditors generally," and that because receiver only had powers to investigate and preserve assets it was not "at this stage, for the purpose of reorganization or liquidation; it is for the protection of investors.").

### 2.   The Cayman Proceeding Was Commenced On The "Just And Equitable" Ground Under A Provision Of The Companies Act That Is Unrelated To Insolvency Or The Adjustment of Debt

44.    For the Cayman Proceeding to qualify as a foreign proceeding, it must also be authorized under a statute that deals with insolvency or the adjustment of debts.  11 U.S.C. § 101(23); *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 138 (S.D.N.Y. 2012).  It is not.  The Cayman Islands Companies Act contains provisions governing the full life cycle of a company,

---

[15] That the JPLs do not owe duties to creditors of a solvent company is acknowledged in the Fox Declaration submitted in support of the Verified Petition.  *See* Fox Decl. at ¶ 25 (The JPLs "owe fiduciary duties to a company to act for proper purposes, in good faith and in the interests of the company as a whole. The interests of the company as a whole are represented by the interests of the unsecured creditors of the company where the company is insolvent, the unsecured creditors and shareholders where the company is of doubtful solvency, *or the shareholders where the company is solvent*.") (emphasis added).

including provisions for winding up insolvent companies and provisions that address the winding up of financially healthy companies.  *See* Asif Decl. ¶ 25-26.

45.      In particular, Section 92 of the Companies Act provides the grounds on which a company may be compulsorily wound up by the Cayman Court.  Section 92(d) relates to insolvent or financially distressed companies, providing that a company may be wound up if "the company is unable to pay its debts."  *See* Asif Decl. ¶ 29.  Section 92(e) provides a separate mechanism for a company to be wound up if "the court is of the opinion that it is just and equitable," regardless of whether the debtor is insolvent or facing financial distress.  *Id.*  Moreover, for a shareholder like Blue Ocean to commence a just and equitable proceeding, it must have a "sufficient" or "tangible" interest in the company (*i.e.*, the company *must be solvent*).  *Id.* at ¶ 30.  Blue Ocean's petition was made under Section 92(e) based on "just and equitable" grounds that are unrelated to Global Cord's insolvency or adjustment of its debts.  *See* Amended Petition, ¶ 69.1-69.3 (listing grounds for winding up on just and equitable basis); Asif Decl. ¶ 21.

46.      UNCITRAL's Guide to Enactment of the Model Law (the "**Enactment Guide**")[16] supports the conclusion that the Cayman Proceeding is not a "foreign proceeding."  Notably, in interpreting Chapter 15, courts must "consider its international origin, and the need to promote an application of [Chapter 15] that is consistent with similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508; *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 136 (2d Cir. 2013) ("[W]e consider international sources to the extent they help us carry out the congressional purpose of achieving international uniformity in cross-border insolvency proceedings.").  Congress has expressly directed courts to look to, among other sources, the Enactment Guide as a key source for

---

[16] *See* UNCITRAL *Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation* (Jan. 2014), *available at* https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf.

interpretation of Chapter 15. *See* House Judiciary Committee, H.R. Doc. No. 109-31 at 106 n.

101, and at 110 (2005) (stating that courts should look to Enactment Guide "for guidance as to the

meaning and purpose of [Chapter 15's] provisions" and that these sources are "[n]ot only . . .

persuasive, but they advance the crucial goal of uniformity of interpretation."); *see also In re RSM*

*Richter Inc. v. Aguilar* (*In re Ephedra Prods. Liab. Litig.*), 349 B.R. 333, 336 (S.D.N.Y. 2006)

("[T]he House Judiciary Committee, in enacting Chapter 15, specifically indicated that the Guide

'should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions.'")

(quoting H.R. Rep. No. 109-31 at 106 n. 101). Case law from foreign courts interpreting statutes

enacting similar versions of the Model Law should also be considered as persuasive authority to

promote uniform interpretation of Chapter 15. *See In re Condor Ins. Ltd.*, 601 F.3d 319; H.R. Rep.

No. 109-31 at 109-110.

47.    After the Model Law's enactment in 1997, UNCITRAL's Working Group V

(Insolvency Law) (the "**Working Group**"), which developed the Model Law, considered issues

regarding the applicability of the Model Law to proceedings involving solvent debtors. At the 40th

Working Group session in 2011, the Working Group considered whether the severe financial

distress or insolvency of the debtor "could be given greater emphasis to ensure clarity as to the

scope of the Model Law." UNCITRAL, *Report of the Working Group on Insolvency Law on the*

*Work of Its Fortieth Session* ¶ 14 (Nov. 21, 2011).[17] The Working Group ultimately concluded

that the Enactment Guide "should focus on the insolvency proceedings covered by the Legislative

Guide and involving financial distress of the debtor." *Id.* at ¶ 16. At the 43rd session of the

Working Group in 2013, relevant amendments to the Enactment Guide were proposed to

---

[17] *Available at*: https://documents-dds-
ny.un.org/doc/UNDOC/GEN/V11/872/54/PDF/V1187254.pdf?OpenElement.

implement these suggestions and were accepted by the Working Group. *See* UNCITRAL, *Report of the Working Group on Insolvency Law on the Work of Its Forty-Third Session*, ¶ 51 (Apr. 26, 2013).[18]

48.    Accordingly, the Enactment Guide was amended in 2014 to reflect the Working Group's decision that the Model Law should only apply to proceedings involving debtors that are insolvent or facing severe financial distress. Following the amendments, the Enactment Guide provides:

> Acknowledging that different jurisdictions might have different notions of what falls within the term 'insolvency proceedings', the Model Law does not define the term 'insolvency'. However, as used in the Model Law, the word "insolvency" refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. The reason is that the Model Law … covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity…. *Where a proceeding serves several purposes, including the winding up of a solvent entity, it falls under [the definition of "foreign proceeding"] only if the debtor is insolvent or in severe financial distress.*

Enactment Guide, ¶ 48 (emphasis added).

49.    Additionally, following the 2014 amendments, the Enactment Guide provides the following guidance with respect to the Model Law's requirement that the proceeding be authorized "under a law relating to insolvency":

> This formulation is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), *but which nevertheless deals with or addresses insolvency or severe financial distress.* The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related

---

[18] *Available at*: https://documents-dds-ny.un.org/doc/UNDOC/GEN/V13/831/21/PDF/V1383121.pdf?OpenElement.

exclusively to insolvency. *A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not one pursuant to a law relating to insolvency or severe financial distress.*

Enactment Guide, ¶ 73 (emphasis added).[19]

50.    Relying on the 2014 revisions to the Enactment Guide, a 2020 decision in England concluded that a just and equitable winding up proceeding of a solvent debtor does not fall within the scope of a "foreign proceeding." *See Re Bailey and another (Sturgeon Central Asia Balanced Fund Ltd.)*, [2020] EWHC 123 (Ch).   In *Sturgeon Central Asia Balanced Fund Ltd.*, the England and Wales High Court (Chancery Division) terminated an order recognizing the liquidation of a solvent Bermuda company authorized on just and equitable grounds that was implemented under England and Wales' Cross-Border Insolvency Regulations 2006 (implementing the Model Law). *Id*.   The English Court concluded that "[i]t would be contrary to the stated purpose and object of the Model Law to interpret 'foreign proceedings' to include solvent debtors and more particularly include actions that are subject to a law relating to insolvency which have the purpose of producing a return to [shareholders] not creditors" and "[a]s the foreign proceedings in this case are for the purpose of winding up a solvent company, which is not in financial distress, the recognition order should be terminated." *Id*. at 5, 8.

---

[19] The Model Law requires a foreign proceeding to be authorized "under a law relating to insolvency," whereas Chapter 15 requires "under a law relating to insolvency *or the adjustment of debt*." 11 U.S.C. § 101(23) (emphasis added). Consistent with the legislative history of the Model Law, "[t]his addition emphasizes that the scope of the Model law and Chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in *severe financial distress*, so long as those proceedings also meet the other criteria of § 101(24)." H.R. Doc. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 118 (2005) (emphasis added). Accordingly, the language Congress added to the definition of "foreign proceeding" does not change the result here—the Cayman Proceeding has nothing to do with the adjustment of debts of an entity encountering financial distress or difficulties.

51.     Notably, the English Court criticized *In re Betcorp Ltd.*,[20] a 2009 Nevada decision recognizing an Australian solvent winding up proceeding under Chapter 15.  The English Court found that because *Betcorp* was decided prior to the introduction of the 2014 Enactment Guide, it "cannot be relied upon to support the proposition that a solvent company entering into liquidation on just and equitable grounds pursuant to insolvency legislation in a foreign jurisdiction is in and of itself sufficient to justify recognition." *Id.* at 96.  The English Court further concluded that "a wrong turn was made in *Betcorp* as it was not an insolvent liquidation but a solvent liquidation … it was necessary to go one step further and ask whether the company was *insolvent or in severe financial distress.*" *Id.* at 121 (emphasis added).[21]

52.     At least one other foreign court has also reached the conclusion that solvent liquidation proceedings are not entitled to cross-border insolvency assistance.  *See In Re Joint Liquidators of Supreme Tycoon Ltd* [2018] HKCFI 277; [2018] 1 HKLRD 1120 (decision from Hong Kong court reasoning that "if the foreign liquidation is a solvent liquidation (for instance, a members' voluntary liquidation), it would not fall within the principle of modified universalism. A foreign solvent liquidation is not a collective insolvency proceeding, and is more akin to [a] 'private arrangement.'").

53.     Here, there is no reason to suspect that Global Cord is insolvent or facing financial distress, given that the nature of a just and equitable proceeding commenced by a shareholder

---

[20] 400 B.R. 266 (Bankr. D. Nev. 2009).

[21] Besides *Betcorp*, it appears that one other U.S. bankruptcy court has recognized an Australian voluntary winding up proceeding under Chapter 15, but in that case the proceeding involved the liquidation of an *insolvent* debtor. *See In re ABC Learning Centres Ltd.*, 445 B.R. 318 (Bankr. D. Del. 2010) on reconsideration in part (Jan. 21, 2011), subsequently aff'd, 728 F.3d 301 (3d Cir. 2013) (recognizing voluntary winding up proceeding of an insolvent debtor commenced under Corporations Act of Australia).  Given that the Australian debtor in *ABC* was insolvent, it is distinguishable from *Betcorp*.

(here, Blue Ocean) necessarily requires the company to be solvent.  *See* Asif Decl. ¶ 47.  Indeed,

the Cayman Proceeding is squarely focused on issues unrelated to insolvency, namely the

Cellenkos Transaction and shareholder control.  And while the JPLs assert "that there appear[s] to

be <u>no</u> precedent in which a U.S. bankruptcy court found that Cayman liquidation or scheme

proceeding did <u>not</u> satisfy the requirements of section 101(23)" (Verified Petition, 26), all of the

cases they cite involve debtors that were insolvent or facing severe financial distress.  *See e.g.*, *In

re Luckin Coffee Inc.*, Case No. 21-10228 (MG) (Bankr. S.D.N.Y. Feb. 5, 2021) [Docket No. 4]

(seeking recognition of Cayman liquidation proceeding where foreign debtor "could not use its

cash to pay its debts as they fell due … [and] sought an order of provisional liquidation to explore

restructuring solutions.");  *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 701-02 (Bankr. S.D.N.Y.

Aug. 24, 2017) (recognizing Cayman proceedings where liquidators sought sanctioning of scheme

of arrangement for foreign debtors that owned deepwater oil drillings experiencing severe financial

distress due to decline in oil prices).[22]  The JPLs cite no analogous cases recognizing a Cayman

just and equitable winding up proceedings commenced by shareholders of a solvent, financially

healthy company.

---

[22] *See also In re Suntech Power Holdings Co., Ltd.,* No. 14-10383 (SMB) [Docket No. 2] (Bankr. S.D.N.Y Feb. 21, 2014) (liquidators appointed to develop schemes of arrangement with creditors following the debtor's payment default on over $500 million of notes); *In re LDK Solar Co., Ltd.*, No. 14-12387 (PJW) [Docket No. 5] (Bankr. D. Del. Nov. 21, 2014) (liquidator sought sanctioning of scheme of arrangement for insolvent debtor); *In re Platinum Partners Value Arbitrage Intermediate Fund Ltd.,* Case No. 17- 12269 (SCC) [Docket No. 2] (Bankr. S.D.N.Y Aug. 17, 2017) (liquidators were appointed to wind up a Cayman-based intermediate fund whose master and feeder funds were both in official liquidation); *In re AJW Offshore Ltd.*, No. 13-70078, [Docket No. 3] (Bankr. E.D.N.Y. Feb. 5, 2013) (offshore funds that could not provide declarations of solvency); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, No. 09-13985 (KG) [Docket No. 4] (Bankr. D. Del. Dec. 17, 2009) (proceeding instigated by lenders of a debtor whose assets were frozen and liquidation was ordered by Cayman Court); *In re Millard*, 501 B.R. 644, 647 (Bankr. S.D.N.Y. 2013) (individual bankruptcies of insolvent debtors).

54.     Accordingly, the Cayman Proceeding was not commenced "under a law relating to insolvency or the adjustment of debt" and, therefore, is not a recognizable "foreign proceeding."

### 3. The Cayman Proceeding Is Not For The Purpose Of Reorganization Or Liquidation

55.     The final requirement of Section 101(23) is that the purpose of the foreign proceeding be for "reorganization or liquidation." 11 U.S.C. § 101(23).  As discussed, the primary relief sought in the petition was to enjoin the Cellenkos Transaction, not to reorganize or liquidate Global Cord.  The Cayman Court has not entered a winding up order or authorized the JPLs to liquidate or reorganize Global Cord's assets, and it may never do so given that the winding up of a solvent company in a just and equitable proceeding is a remedy of last resort.  *See* Asif Decl. ¶ 32.

56.     The JPLs' rank speculation that "the proceedings (unless dismissed) are expected to result in the reorganization or liquidation of the Debtor" is plainly insufficient to establish the existence of a "foreign proceeding."  *See In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 906 (Bankr. S.D. Fla. 2010) ("Because the Bahamas Court had ordered neither a winding up nor a reorganization of [the debtor], on the date of the chapter 15 petition here the Bahamas Proceeding was not 'for the purpose of reorganization or liquidation' and therefore was not a 'foreign proceeding.'").

57.     Further, as explained in the Enactment Guide:

> Some types of proceeding that may satisfy certain elements of the definition of foreign proceeding … may nevertheless be ineligible for recognition because they are not for the stated purpose of reorganization or liquidation. They may take various forms, *including proceedings that are designed to prevent dissipation and waste, rather than to liquidate or reorganize the insolvency estate; proceedings designed to prevent detriment to investors rather than to all creditors (in which case the proceeding is also likely not to be a collective proceeding)*; or proceedings in which the powers conferred and the duties imposed upon the foreign representative

*are more limited than the powers or duties typically associated with
liquidation or reorganization, for example, the power to do no more
than preserve assets.*

Enactment Guide, ¶ 77.

58.    In the Cayman Proceeding, the appointment of the JPLs is designed to prevent

detriment to investors rather than to all creditors, which the Enactment Guide warns should not be

considered for "the purpose of reorganization or liquidation" under the Model Law and "is also

likely not to be a collective proceeding." *Id.* In essence, the Cayman Proceeding is simply a

dispute between Blue Ocean and Global Cord—one aggrieved party asking the court to intervene

to resolve a situation in which it believes it has been wronged. Further, the JPLs are only

empowered to preserve assets not to liquidate or reorganize the affairs of Global Cord. Therefore,

the Cayman Proceeding is insufficient to satisfy this definitional requirement pursuant to the

Enactment Guide's guidance.

59.    The JPLs' title as "provisional liquidators" is actually a misnomer in this case

because the nature of the appointment of provisional liquidators, and their role, is fundamentally

different to that of an official liquidator who is appointed when a winding-up order is made. *See*

Asif Decl. ¶ 38. As a leading practitioner text often referred to by Cayman courts has put it, "the

name 'provisional liquidator' is misleading because *the one thing that a provisional liquidator of

a company does not do is carry out the liquidation of the company.*"[23] Additionally, the JPLs

were appointed under Section 104(2) of the Companies Act, as opposed to under Section 104(3).

*See* JPL Appointment Order, Recitals (noting JPLS were appointed pursuant to Section 104(2) of

the Companies Act). This is a critical distinction. Provisional liquidators are appointed under

---

[23] Derek French, *Applications to Wind Up Companies* (Fourth Edition), Apr. 2021 at ¶ 4.15.
(emphasis added).

Section 104(3) for the purpose of proposing a scheme of arrangement or compromise with creditors, whereas the purpose of an appointment under Section 104(2) is (i) to prevent the dissipation or misuse of the company's assets; (ii) to prevent the oppression of minority shareholders; or (iii) to prevent mismanagement or misconduct on the part of the company's directors.  *See* Asif Decl. ¶¶ 41-44.  The appointment of provisional liquidators under Section 104(2) serves the exact purposes that the Enactment Guide cautions *do not* satisfy the eligibility requirement for recognition under the Model Law.  See Enactment Guide, ¶ 77.

60.     Indeed, the Chapter 15 cases cited in the Verified Petition recognizing Cayman proceedings are distinguishable in that they involve proceedings where (i) an *official* (permanent) liquidator has been appointed after a winding up order was entered, or (ii) a provisional liquidator had been appointed under Section 104(3) of the Companies Act to propose a scheme of arrangement or compromise of debt with creditors.  *See e.g.*, *In re Platinum Partners Value Arbitrage Intermediate Fund Ltd.*, Case No. 17- 12269 (SCC) (Docket No. 3-2) (Bankr. S.D.N.Y. Aug. 17, 2017) (winding up order entered appointing permanent joint official liquidators as opposed to provisional liquidators); *Suntech Power Holdings Co. Ltd*, No. 14-10383 (SMB) (Docket No. 2-1) (Bankr. S.D.N.Y Feb. 21, 2014) (order appointing provisional liquidators under Section 104(3) to develop schemes of arrangement).[24]  That is simply not the case here.

61.     In fact, it is clear that the Cayman Proceeding is not for the purpose of reorganization or liquidation based on the JPLs' own report to the Cayman Court (the "**Interim**

_____

[24] *See also Luckin Coffee Inc.*, Case No. 21-10228 (MG) (Bankr. S.D.N.Y. Feb. 5, 2021) [Docket No. 1] (order appointing joint provisional liquidators promote a scheme of arrangement); *In re Ocean Rig UDW Inc.*, Case No. 17-10736 (MG) (Bankr. S.D.N.Y. Mar. 27, 2017) (same); *In re LDK Solar Co., Ltd.*, No. 14-12387 (PJW) [Docket No. 5] (Bankr. D. Del. Nov. 21, 2014) (same); *In re AJW Offshore Ltd.*, No. 13-70078, [Docket No. 1] (Bankr. E.D.N.Y. Jan. 1, 2013) (winding up order appointing official liquidators); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, Case No. 09-13985 (KG) [Docket No. 2-34] (Bankr. D. Del. Dec. 11, 2009) (same).

Report"), dated October 20, 2022, and disclosed through an SEC filing made on October 31, 2022. *See* Conte Decl. Ex. M.  The Interim Report details the JPLs' activities, showing that they have focused on investigating and asserting control over Global Cord's corporate group rather than liquidating or restructuring Global Cord, and that the JPLs anticipate doing so through the end of the year.  *See* Interim Report, ¶ 4.2, 6 (describing actions taken by JPLs since appointment); ¶ 4.3 (listing "key findings" of JPLs' investigation); ¶ 9.4 (describing "Next Steps" that are focused on the JPLs' mandate to preserve assets and conduct an investigation, *not* reorganize or liquidate Global Cord's assets).[25]

62.    Finally, recognition of a Cayman "just and equitable" winding up proceeding based on the facts in this case would be inconsistent with the purpose of Chapter 15.  Bankruptcy Code Section 1501 provides that "the purpose [of Chapter 15] is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border *insolvency*."  11 U.S.C. § 1501 (emphasis added).  And the stated objectives of Chapter 15 include, among others, the "fair and efficient administration of cross-border insolvencies *that protects the interests of all creditors*, and other interested entities" and the "facilitation of the rescue of *financially troubled businesses*."  11 U.S.C. § 1501(a)(3), (5) (emphasis added).  Chapter 15 is neither designed nor intended to provide U.S. bankruptcy relief in aid of non-U.S. proceedings, like the Cayman Proceeding, dealing with claims of shareholder oppression.

---

[25] Section 8.1 of the Interim Report notes that the JPLs have incurred significant costs and are seeking third party funding because the JPLs do not have control over Global Cord's operating cash.  In the interests of transparency, the JPLs should disclose how they are being funded and, in particular, whether Blue Ocean is involved.

63.    For these reasons, the JPLs have failed to satisfy their burden of demonstrating that the Cayman Proceeding is for the purpose of reorganization or liquidation.[26]

### 4. In The Alternative, The Court Should Defer Ruling On The Verified Petition Until After A Final Decision On Blue Ocean's Amended Petition in the Cayman Proceeding

64.    As an alternative to denying recognition, the Court should defer a decision on the Verified Petition until after a final decision on Blue Ocean's Amended Petition in the Cayman Proceeding. Postponing a decision on the Verified Petition is appropriate under the circumstances given that, among other things, (i) the Cayman Court may never enter any order winding up Global Cord or authorizing the JPLs to liquidate the company; (ii) Blue Ocean's standing and authority to bring and continue prosecuting the Cayman Proceeding is disputed; and (iii) Blue Ocean is aggressively pursuing U.S. discovery on its own through the Texas 1782 Proceeding. Indeed, "Chapter 15 recognizes that the status of the foreign proceeding can change, and the change can affect the right to recognition before or after it is granted." *In re Oversight & Control Comm'n of Avanzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008).

65.    Deferring a ruling on the Verified Petition would not be inconsistent with Section 1517(c), which provides that a petition for recognition "shall be decided at the earliest possible time." 11 U.S.C. § 1517(c). With respect to the analogous provision of the Model Law, the Enactment Guide states that "the foreign representative's ability to obtain early recognition … is

---

[26] It also follows that the JPLs are not "foreign representatives" for purposes of Chapter 15. Foreign representative is defined as "a person or body, including a person or body appointed on an interim basis, *authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding*." 11 U.S.C. § 101(24) (emphasis added). The Cayman Proceeding is not a "foreign proceeding" and the JPLs have not been authorized to administer the reorganization or the liquidation of Global Cord's assets. Because the JPLs do not satisfy the definition of "foreign representative", then by definition they have also not satisfied the requirement of Section 1515(b), which requires that the petition for recognition be accompanied by evidence of the appointment of the foreign representative. 11 U.S.C. § 1515(b).

often essential for the effective protection of the assets of the debtor from dissipation and concealment." Enactment Guide, ¶ 163. The Enactment Guide further provides that "[t]he phrase 'at the earliest possible time' has a degree of elasticity" and in cases where recognition is contested the phrase may be "measured in months." *Id*. The JPLs have not alleged that recognition is necessary to protect U.S. assets of the debtor from dissipation and concealment, nor have they identified any exigent circumstances that would require immediate relief. And, as noted, Blue Ocean is already pursuing U.S. discovery regarding the Cellenkos Transaction through the Texas 1782 Proceeding.

**C.      Even if the Cayman Proceeding Is Recognized, Discretionary Relief Pursuant Section 1521 Should Be Denied**

66.      Even if this Court were to recognize the Cayman Proceeding (which it should not), the Court should deny the JPLs' request for discretionary relief under Section 1521. Section 1521 provides that upon recognition the court may affirmatively grant appropriate relief "where necessary to effectuate the purposes of [Chapter 15] and to protect the assets of the debtor or the interests of creditors." 11 U.S.C. § 1521(a). Such relief includes, among other things, "providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities" and "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative." 11 U.S.C. §1521(a)(4), (5). The Court may grant relief under section 1521 "only if the interests of the creditors and other interested entities … are sufficiently protected." 11 U.S.C. §1522(a); *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010).

67.      Here, the JPLs seek relief under section 1521 but fail to meet their burden of demonstrating why such relief is appropriate. Indeed, the Verified Petition and accompanying

declarations do not provide any justification for why discretionary relief should be granted in this case or how interests of creditors and other interested parties are sufficiently protected.  The bare-bones discussion on this point only reveals that the JPLs are seeking subpoena power under Section 1521 "to compel disclosure from persons in the United Sates who they believe have information that would assist them in our investigation of the Transaction with Cellenkos and their pursuit of the Debtor's assets."  Verified Petition ¶ 22.

68.    This is concerning because the JPLs fail to even mention that Blue Ocean has already sought broad discovery against Cellenkos and related parties to use in litigation in the Cayman Islands and British Virgin Islands through the Texas 1782 Proceeding. Judicial assistance pursuant to 28 U.S.C. 1782 is "specifically designed to provide foreign litigants with access to U.S. discovery in appropriate cases." *In re Bd. of Directors of Hopewell Int'l Ins. Ltd.*, 258 B.R. 580, 586 (Bankr. S.D.N.Y. 2001).  Accordingly, the Texas 1782 Proceeding is the more appropriate forum to consider whether U.S. discovery related to the Cellenkos Transaction should proceed, because at the heart of the Cayman Proceeding is a dispute between shareholders, wholly unrelated to any type of collective insolvency proceeding.[27]

69.    Accordingly, the JPLs' request for discretionary relief pursuant to section 1521 of the Bankruptcy Code should be denied.

---

[27] For the avoidance of doubt, GMSC reserves all rights, remedies and arguments in connection with the Texas 1782 Proceedings.

## **CONCLUSION**

70.     For the reasons set forth herein, GMSC respectfully submits that the relief sought

in the Verified Petition should be denied or, in the alternative, the Court should not consider the

Verified Petition until the Cayman Court has rendered a final decision on Blue Ocean's Amended

Petition.


Dated: November 3, 2022
New York, New York

Respectfully submitted,

**KOBRE & KIM LLP**


/s/ *Daniel J. Saval*
Daniel J. Saval
John G. Conte
800 Third Avenue
6th Floor
New York, New York 10022
Tel: (212) 488-1200
Daniel.Saval@kobrekim.com
John.Conte@kobrekim.com

*Counsel to Golden Meditech Stem Cells
(BVI) Company Limited*