**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------
In re:                                              )
                                                    )
                                                    )        Chapter 15
GLOBAL CORD BLOOD CORPORATION,                      )
                                                    )        Case No. 22-11347 (DSJ)
                                                    )
         Debtor in a Foreign Proceeding.            )
-----------------------------------------------------------------

## MEMORANDUM OF DECISION AND ORDER DENYING CHAPTER 15 PETITION FOR RECOGNITION OF A FOREIGN PROCEEDING

**APPEARANCES:**

**MORGAN, LEWIS BOCKIUS LLP**
*Counsel for Joint Provisional Liquidators of Global Cord Blood Corporation*
101 Park Avenue
New York, NY 10178
By:    Joshua Dorchak, Esq.
       John C. Goodchild, Esq.
       Matthew C. Ziegler, Esq.

**KOBRE & KIM LLP**
*Counsel for Golden Meditech Stem Cells (BVI) Company Limited*
800 Third Avenue
6th Floor
New York, NY 10022
By:    Daniel J. Saval, Esq.
       John G. Conte, Esq.

**WHITE & CASE LLP**
*Counsel for Independent Directors of Global Cord Blood Corporation*
111 South Wacker Drive
Suite 5100
Chicago, Illinois 60606
By:    Bojan Guzina, Esq.

**DAVID S. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

This Chapter 15 case arises out of proceedings pending in the Grand Court of the Cayman Islands ("**Cayman Proceeding**").  In response to evidence suggesting that a company's board and/or officers caused or allowed an improper expenditure of more than $600 million of corporate funds, the Grand Court appointed Joint Provisional Liquidators ("**JPLs**") as fiduciaries to investigate and, if appropriate, seek to recover misappropriated funds, and/or to take other actions as may be appropriate based on the findings of their investigation.  The Cayman Grand Court conferred extensive corporate powers on the JPLs and divested the power of a number of the company's board members.

The JPLs have petitioned this Court for recognition of the Cayman Proceeding under Chapter 15 of the U.S. Bankruptcy Code.  This application, which has drawn two objections, tests the limits of how broadly Chapter 15 can be applied to assist a foreign court in its conduct of a case that does not involve insolvency or the identification, classification, or satisfaction of debts.

For reasons detailed below, the Court concludes that, on the present record, the Cayman Proceeding does not satisfy the Bankruptcy Code's definition of a "foreign proceeding" and, accordingly, is not eligible for recognition under Chapter 15.  At bottom, the Court concludes that the Cayman Proceeding, which arises under various subsections of the Cayman Islands Companies Act ("**Companies Act**"), is most akin to a corporate governance and fraud remediation effort, and is not a collective proceeding for the purpose of dealing with insolvency, reorganization, or liquidation.  As such, the Cayman Proceeding at its present stage falls outside the range of proceedings that Chapter 15 was designed to assist.

To hold otherwise would be to invite recourse to U.S. bankruptcy courts whenever any foreign corporation sustains losses as a result of officer or director fraud or defalcation, so long as that corporation first commences proceedings in its home jurisdiction seeking to install new fiduciaries and right the wrong that the corporation has suffered. Although Chapter 15 is to be applied broadly to provide assistance to a wide variety of foreign proceedings, the proceeding here—at its present stage—falls outside the range of types of proceedings that have been found eligible for assistance under Chapter 15, and outside the meaning of applicable provisions of the Bankruptcy Code.

The Petition is therefore denied, without prejudice to future applications by the JPLs or other authorized representatives if warranted by future developments in the Cayman Proceeding or elsewhere.

## BACKGROUND

The Court conducted a hearing on November 10, 2022, and, by agreement of the parties, received in evidence declarations submitted by each side, along with exhibits. No party opted to question any witness despite having been afforded the opportunity to do so.

This factual background section draws on that evidentiary record, which includes substantial portions of the record of the Cayman Proceeding. Neither party questioned the factual accuracy of any of the statements and facts presented about the Cayman Proceeding, although each party contests the inferences and legal significance of those facts and parties opposing recognition dispute the JPLs' claims of malfeasance. The Court therefore credits the factual content of the parties' submissions, which form the factual basis of the Court's ruling. The salient background is as follows.

3

Three Joint Provisional Liquidators who have been appointed by the Grand Court of the Cayman Islands in a matter relating to Global Cord Blood Corporation ("**Global Cord Blood Corp.**" or the "**Company**") have petitioned this Court for recognition of what they assert is a foreign main proceeding pending in the Grand Court of the Cayman Islands. [ECF Nos. 1, 2]. The JPLs seek recognition of the Cayman Proceeding as a foreign main proceeding or, in the alternative, as a foreign nonmain proceeding; they also seek related relief including authorization to conduct discovery in the United States in connection with assertedly fraudulent misconduct including what the JPLs assert was a possible misappropriation of more than $600 million in corporate funds.

Two groups—a group of now-disempowered former directors of the Company, and another entity with an interest in the company (collectively the "**Objectors**")—oppose the application for recognition. [*See* ECF Nos. 12, 16]. An "Objection" [ECF No. 12] was filed by Golden Meditech Stem Cells (BVI) Company Limited ("**Golden Med**"), which asserts that it holds a direct or indirect ownership stake in Global Cord Blood Corp. Individuals who term themselves Independent Directors of Global Cord Blood Corporation filed a "Statement in Support" [ECF No. 16] of Golden Med's objection. The Objectors argue, in essence, that recognition is inappropriate because the Cayman proceeding is not a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code, and, accordingly, the proceeding is ineligible for recognition under section 1517 of the Code.

### 1.  Global Cord Blood Corp.

Global Cord Blood Corp. is a Cayman Islands exempted company that primarily operated in the People's Republic of China ("**PRC**") with headquarters in Hong Kong. [ECF No. 3 at ¶¶ 9, 12]. The Company's business deals with collecting and storing umbilical cord blood for its stem

cell content. [ECF No. 2 at ¶ 10]. The Company is or was a sizeable concern with shares that traded on the New York Stock Exchange. [*See* ECF No. 3 at ¶ 10].

Golden Med frames the Cayman Proceeding as the outgrowth of a longstanding struggle for corporate control waged by two shareholders through multiple layers of holding companies. [*See* ECF. No. 12 at ¶¶ 9–17]. Two entities—Golden Med and Blue Ocean Structure Investment (BVI) Company Limited ("**Blue Ocean**")—assert conflicting ownership stakes in Global Cord Blood Corp. [*Id.* at ¶¶ 9–19]. According to Golden Med, this dispute is the subject of ongoing litigation in the British Virgin Islands. [*Id.* at ¶¶ 26–28].

Blue Ocean alleges that, in April 2022, Global Cord Blood Corp. entered into a questionable transaction that transferred or purported to transfer millions of new shares of stock and over $600 million in corporate funds to two companies, including one called Cellenkos (the "**Cellenkos Transaction**"). [*See* ECF Nos. 3-3 at ¶¶ 17–32, 12 at ¶ 21]. This transaction is the subject of the Cayman Proceeding. [ECF No. 2 at ¶ 12].

## 2. The Cayman Proceeding

Blue Ocean, as a significant shareholder of Global Cord Blood Corp., sought relief from the Cellenkos Transaction in the Grand Court of the Cayman Islands by filing a "Winding Up Petition" on May 5, 2022. [ECF No. 3-2]. In its petition, Blue Ocean alleges that some combination of Global Cord Blood Corp. officers and a controlling subset of directors, with no notice or insufficient notice to shareholders, committed to the Cellenkos Transaction, which Blue Ocean contends would radically dilute the value of the shareholders' shares. [*See* ECF No. 3-2 at ¶ 42]. Blue Ocean sought relief from the transaction, which representatives of the company opposed. Blue Ocean alleges that the transaction in question was in furtherance of improper and

self-serving transactions that violated the fiduciary duties of board members and/or officers. [ECF No. 3-3 at ¶ 32]. The Cellenkos Transaction is described in detail in Blue Ocean's petition and amended petition to the Grand Court. [ECF Nos. 3-2, 3-3].

The Winding Up Petition sought relief including an order that the Company refrain from proceeding with the Cellenkos Transaction, and an order requiring revisions to its "Memorandum and Articles of Association" to limit the board's authority in various ways to unilaterally change the Memorandum and Articles of Association, to create shares of any class representing more than 20% of the issued and outstanding shares of the Company, and from engaging in actions or transactions that would result in a change in control of the Company, as well as related and similar relief. [ECF No. 3-2 at ¶¶ 44.1–44.2]. The petition also sought an order requiring an Extraordinary General Meeting of shareholders to propose removal of the Board and to consider an alternative proposed by Blue Ocean. [*Id.* at ¶ 44.3]. The petition sought "in the alternative" that the Company be "wound up pursuant to section 92(e) of the Companies Act." [*Id.* at ¶ 45.1]. The JPLs have not shown that any steps to wind-up the company have been taken, and section 92(e) does not reference or require insolvency, nor the classification, adjustment, or resolution of specific debts. Rather, section 92(e) of the Companies Act allows the Court to wind-up a company if "the [Grand] Court is of the opinion that it is just and equitable that the company should be wound up." Cayman Is. Companies Act § 92(e) (2022 Revision).

By contrast, section 92(d) of the Companies Act permits the court to wind-up a company if "the company is unable to pay its debts." But neither the petition [ECF Nos. 3-2, 3-3] nor the resulting order of the Grand Court appointing the JPLs [ECF No. 2-1] references or relies on section 92(d), nor does the Cayman Proceeding as a whole seek to ascertain the amount of the

Company's debts, the identity of its creditors, or terms on which those debts are to be satisfied or adjusted.

The May 2022 petition further sought the alternative relief of appointment of joint official liquidators and asked that they be granted various powers in connection with the proposed wind-up of the company. [ECF No. 3-2 at ¶ 45]. Again, their proposed appointment referenced only section 92(e) of the Companies Act (*i.e.*, the general equitable provision), not the debt-related section 92(d). [*Id.*; *see also* ECF No. 3-3 at ¶ 71]. The Companies Act provides for the appointment of official liquidators to carry out the winding up process. *See* Companies Act § 105. Cayman law also provides that "the [Grand] Court may, at any time after the presentation of a winding up petition but before the making of a winding up order, appoint a liquidator provisionally." Companies Act § 104(1).

On August 22, 2022, Blue Ocean filed a summons and sought appointment of joint provisional liquidators pursuant to section 104(2) of the Companies Act. [*See e.g.,* ECF No. 3-5 at ¶ 4]. That provision authorizes applications for appointment of provisional liquidators—rather than official liquidators—on the grounds that there is a prima facie case for making a winding up order, and that appointing a provisional liquidator is necessary to prevent dissipation or misuse of corporate assets, or to prevent oppression of minority shareholders, or to prevent mismanagement on the part of the company's directors. Companies Act § 104(2).

Section 104(2) does not mention or require any showing of insolvency. By contrast, Companies Act section 104(3) does concern debt and insolvency, and authorizes appointing a provisional liquidator "ex parte on the grounds that — (a) the company is or is likely to become unable to pay its debts . . . and (b) the company intends to present a compromise or arrangement

to its creditors." But neither the May 2022 petition nor its subsequent amendment invoked section 104(3). [*See* ECF Nos. 3-2, 3-3].

In May 2022, the Grand Court granted an injunction against closing the Cellenkos Transaction. [*See* ECF No. 3-4 at ¶ 2]. Yet, the court lifted the injunction in July 2022 based on Global Cord Blood Corp.'s representation that the transaction had been partially performed. [*Id.* at ¶¶ 22, 76; *see* ECF No. 3-5 at ¶¶ 10, 20].

In approximately September 2022, evidence emerged that incumbent board members and/or officers seemingly forged financial records to oppose Blue Ocean's application by making it appear that the transaction was partially completed. [ECF No. 3-5 at ¶¶ 8–10]. Blue Ocean contended that it appears that substantially all of the Cellenkos Transaction was forged [ECF No. 3-3 at ¶¶ 54–56] and that that transaction was designed to conceal the disposition of roughly $500 million in corporate assets Blue Ocean asserts were unlawfully siphoned off over several years [*id.* at ¶¶ 57–58; *see also* ECF No. 3-5 at ¶ 26, 27 at ¶ 5(b) n.4].

These updated allegations are set forth in an "Amended Winding Up Petition" [ECF No. 3-3] filed in the Cayman Proceeding on September 22, 2022. Among other things, the amended petition alleges that the Company proceeded with the Cellenkos acquisition without proper notice or authorizations, that the acquisition was for a vastly inflated price and was contrary to the best interests of Global Cord Blood Corp., and that the transaction was a self-interested transaction that improperly benefited a formal or informal insider of Global Cord Blood Corp. who as of April 2022 also owned more than half of the acquired entity, Cellenkos. [*Id.* at ¶¶ 20, 29–43].

On September 22, 2022, the Grand Court entered an order [ECF No. 2-1] ("**Appointment Order**") granting relief conditioned on an undertaking by Blue Ocean as petitioner that it will

comply with any future order holding that the Appointment Order caused loss to the Company by paying up to the value of Blue Ocean's stock [*id.* at 2]; the order directed the appointment of the individuals as "Joint Provisional Liquidators" of the Company [*id.* at ¶ 1].  The Grand Court followed its order with a judgment entered on September 28, 2022.  [ECF 3-5].  The Appointment Order and accompanying judgment recited that the order was issued upon application of petitioner Blue Ocean dated August 22, 2022, and that that application was made pursuant to section 104(2) of the Companies Act.  [ECF Nos. 2-1 at 1, 3-5 at ¶¶ 1, 2].

Under Cayman Law, the JPLs' powers are limited by the court order appointing them.  *See* Companies Act § 104(4).  By its order, the Grand Court directed the JPLs to take such steps as they conclude in their discretion may be necessary or expedient to "protect and preserv[e] the value of the Company's assets, rights and/or property," and to "prevent[] the dissipation or misuse of the Company's assets."  [ECF No. 2-1 at ¶ 4].  The Grand Court also directed the JPLs to investigate and report on the affairs of the Company within and without the Cayman Islands, including in PRC and Hong Kong.  [*Id.* at ¶ 5].  More specifically, the order authorized the JPLs to "take possession of, collect and get in the property of the Company"; to act "on behalf of the Company"; to discharge "costs, expenses and debts" of the Company; and to take a variety of actions in furtherance of their responsibilities.  [*Id.* at ¶ 6].  The Appointment Order "suspended" the powers of the Company's Board unless restored by the JPLs.  [*Id.* at ¶ 9].  And the Grand Court ordered or gave effect to the provision of section 97 of the Companies Act, which bars the commencement of suits or other proceedings against the company except with leave of court.  [*Id.* at ¶ 14].

The Grand Court further authorized the JPLs to "commence winding up proceedings and/or any insolvency process in the Cayman Islands or any other country."  [*Id.* at ¶ 8(b)].  However, the record does not reflect the commencement of any winding up proceeding or insolvency process—

whether in the exercise of this power, or otherwise.  The record includes a sworn statement that no

such winding up proceeding has begun [ECF Nos. 14 at ¶ 22, 27 at ¶ 24], and the JPLs did not

contend or present evidence to the contrary.  Moreover, the JPLs state that they "believe [Global

Cord Blood Corp.] is solvent."  [ECF No. 26 at ¶ 1].

Finally, the Appointment Order authorizes the JPLs "to take any such action as may be

necessary or desirable to obtain recognition of the JPLs and/or their appointment in the PRC, Hong

Kong and in any other relevant jurisdiction and to make applications to the courts of such

jurisdictions for that purpose or for the purpose of obtaining information to assist them in their

investigations . . . ."  [ECF No. 21 at ¶ 10].

### 3.   The Texas 1782 Proceeding

In July 2022, Blue Ocean filed an application with the United States District Court for the

Southern District of Texas seeking judicial assistance pursuant to 28 U.S.C. § 1782.  [ECF No. 13-

4; *see* ECF No. 12 at ¶¶ 29–32]. *See generally In re Application of Blue Ocean Structure Inv. Co.*

*Ltd. for Discovery in Aid of Foreign Proc. Pursuant to 28 U.S.C. § 1782,* Case No. 4:22-mc-01161

(S.D. Tex.).  Blue Ocean sought the appointment of a commissioner to issue subpoenas to

Cellenkos and certain other related parties to produce documents related to the Cellenkos

Transaction for use in the Cayman Proceeding and the BVI Proceeding.  [ECF No. 13-4].  The

District Court granted the application in an order entered on July 20, 2022.  [ECF No. 13-5].  On

September 8, 2022, Cellenkos and the other respondents filed a motion to vacate the order.  [ECF

No. 13-6].  On October 28, 2022, Blue Ocean filed a Sur-Reply to the motion to vacate.  [ECF No.

13-7].

### 4.   Chapter 15 Petition for Recognition

Against this backdrop, the JPLs, acting as foreign representatives, filed a standard form Chapter 15 Petition for Recognition of a Foreign Proceeding in this Court [ECF No. 1], accompanied by a more detailed "Verified Chapter 15 Petition for Recognition of Foreign Proceeding and Related Relief" [ECF No. 2]. The Verified Petition attaches the Cayman Court's Appointment Order. [ECF No. 2-1]. The petition seeks as relief entry of a proposed order attached to the application, and paragraph 21 of the Verified Petition summarizes that requested relief as (a) recognition of the Cayman Proceeding pursuant to Bankruptcy Code section 1517 as a "foreign main proceeding," (b) relief available under sections 1520(a) and 1520(b) including the ability to examine witnesses and take evidence, and (c) "such other and further relief as is appropriate." [ECF No. 2].

Golden Med opposes recognition, essentially on the basis that the Cayman Proceeding is brought under the Cayman Companies Act's "just and equitable" powers, not its powers relating to the adjustment or satisfaction of debtors or the liquidation or "winding up" of companies or the adoption of a scheme of arrangement to resolve the company's debts. [ECF No. 12 at ¶¶ 44–45]. Thus, Golden Med objects, the Cayman Proceeding does not involve insolvency, does not address the debts and/or creditors of Global Cord Blood Corp., and, rather, is an effort under the Cayman Companies Act to appoint JPLs as fiduciaries to take over substantial organizational responsibility for Global Cord Blood Corp. and to investigate and potentially recover allegedly misappropriated corporate funds. [*Id.* at ¶ 22]. Golden Med asserts that the Cayman Proceeding therefore does not constitute a "foreign proceeding" as defined by Bankruptcy Code section 101(23), and that, in the absence of such a proceeding, this Court must decline to enter an order granting "recognition" under Bankruptcy Code section 1517. [*Id.* at ¶ 39].

At the conclusion of the hearing on November 10, 2022, the Court reserved decision.

**ANALYSIS**

Chapter 15 of the Bankruptcy Code is titled "Ancillary and Other Cross-Border Cases," and Code section 1501 explains that "[t]he purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with . . . objectives" including "(1) cooperation between—(A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases." 11 U.S.C. § 1501(a). The chapter "applies where," in relevant part, "assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding." 11 U.S.C. § 1501(b)(1). The Bankruptcy Code defines "foreign proceeding," 11 U.S.C. § 101(23), and this opinion turns on whether petitioners satisfy that definition here.

By way of further legal background, a Chapter 15 case is commenced by the foreign representative of a debtor filing a petition for recognition of a foreign proceeding. *See* 11 U.S.C. §§ 1504, 1515(a). The petition must be accompanied by certain documents that are presumed authentic in the absence of contrary evidence. *See* 11 U.S.C. §§ 1515(b), 1516(b); *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008). Section 1517 of the Bankruptcy Code identifies the requirements for recognition of a foreign proceeding. It provides that an order recognizing a foreign proceeding shall be entered if "(1) such foreign proceeding . . . is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a). Recognition is mandatory if all three requirements of Section 1517(a) are met. *See* 11 U.S.C. § 1517(a). "But recognition is not a

rubber stamp exercise," and the burden rests on the foreign representative to prove each of the requirements of Section 1517. *In re Creative Fin. Ltd.*, 543 B.R. 498, 514 (Bankr. S.D.N.Y. 2016) (citations omitted).

Although it does not come into play here, section 1506 of the Bankruptcy Code includes an overriding public policy exception, providing that a court may refuse to take an action under Chapter 15 if such action "would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The exception is read narrowly, with legislative history stating that "the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." *Morning Mist Holdings Ltd. v. Krys* (*In re Fairfield Sentry Ltd.*), 714 F.3d 127, 139 (2d Cir. 2013) (quoting H.R.Rep. No. 109-31, at 109 (2005)). Thus, "even the absence of certain procedural or constitutional rights will not itself be a bar under [section] 1506." *In re OAS S.A.*, 533 B.R. 83, 104 (Bankr. S.D.N.Y. 2015) (quoting *Ad Hoc Grp. of Vitro Noteholders v. Vitro S.A.B. de C.V.* (*In re Vitro*), 701 F.3d 1031, 1069 (5th Cir. 2012)).

Here there is no serious dispute that the JPLs are a "person or body" and that their petition for the most part meets the formal requirements of section 1515 of the Bankruptcy Code. However, there is a serious question whether the Cayman Proceeding constitutes a "foreign proceeding" as is defined by section 101(23) of the Code, and as is required for recognition under section 1517. *See, e.g.*, *In re Millard*, 501 B.R. 644, 649 (Bankr. S.D.N.Y. 2013) ("presence, or not, of a 'foreign proceeding' as used in section 1517(a)(1), as ultimately defined in section 101(23), determines whether [a court] should grant recognition") (internal citations omitted); *In re Vitro*, 701 F.3d at 1044 ("Only after a United States court recognizes a proceeding can 'the foreign representative

. . . apply directly to a court in the United States for appropriate relief in that court.'") (quoting 11 U.S.C. § 1509(b)(2)).

> The Bankruptcy Code defines "foreign proceeding" as:
>
> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23). As a general matter, this definition "is to be broadly construed." *E.g., In re Bd. of Dirs. of Telecom Argentina S.A.*, 2006 WL 686867, at *21, 22 (Bankr. S.D.N.Y. Feb. 24, 2006); *In re MMG LLC*, 256 B.R. 544, 550 (Bankr. S.D.N.Y. 2000) (same); *see* 2 Collier on Bankruptcy ¶ 101.23 (16th ed. 2022) ("Courts have construed the definition of 'foreign proceeding' broadly."); *In re Netia Holdings S.A.*, 277 B.R. 571, 580–81 (Bankr. S.D.N.Y. 2002) (the definition "by its terms encompasses a broad array of types of proceedings"). Broad construction of proceedings eligible for Chapter 15 recognition helps ensure that other nations using varied approaches in addressing insolvencies will receive the assistance of the U.S. courts. *See, e.g., In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Chapter 15 . . . provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity.") (quoting *In re Rede Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014)); *In re B.C.I. Fins. Pty Ltd.*, 583 B.R. 288, 292 (Bankr. S.D.N.Y. 2018) ("Chapter 15 and the Model Law are designed to optimize disposition of international insolvencies by facilitating appropriate access to the court system of a host country (the United States, in the case of Chapter 15) by a representative of an insolvency proceeding pending in a foreign country.") (quoting *In re Bear Stearns*, 389 B.R. at 333). At the same time, however, the resulting flexibility is not limitless, and, as in all questions of statutory construction, the statutory "words to be interpreted are not considered in isolation; rather, [courts] 'look[ ] to the statutory scheme as a

whole and plac[e] the particular provision within the context of that statute.'" *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)).

Courts construing section 101(23) have required the petitioner to establish each of seven criteria: "(i) [the existence of] a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation." *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *In re ENNIA Caribe Holding N.V.*, 594 B.R. 631, 638 (Bankr. S.D.N.Y. 2018). If the JPLs fail to meet their burden of proof on any one of these seven "definitional elements," then the Cayman Proceeding is not a "foreign proceeding" within the meaning of Chapter 15. *In re Ashapura*, 480 B.R. at 136.

Here, there is no dispute that four of these elements are satisfied, and the Court concludes that they are. But the Objectors contend that the JPLs have failed to establish three required elements of this definition, namely, (1) the existence of a "collective proceeding"; (2) that is "under a law relating to insolvency or adjustment of debt" with foreign court control of the debtor's assets; and (3) that is "for the purpose of reorganization or liquidation." The JPLs contend that they have established all required elements, including these.

1.   **"Collective" Proceeding**

First, as to whether the proceeding is "collective," relevant case law typically speaks in terms of the proceeding's treatment of and potential benefit to creditors, as well as emphasizing that the proceeding must concern all interests or the interests of a creditor body as a whole, not just individuals. There is no dispute that Global Cord Blood Corp.'s creditors have not received formal notice of the Cayman proceeding, nor been granted standing to participate in the Cayman Proceeding; nor has the Cayman Proceeding involved any effort to identify or classify creditors or determine how and whether to satisfy their claims. [Hr'g Tr., ECF No. 30 at 22:14–22 (The Court: "I just want to make sure I'm understanding correctly that as of now, there's no process in place or underway by which creditors are identifying themselves, claims are being stated, creditors are being grouped into categories of similar claims, distribution plans are being made, any of that, right? There's none of that happening?" Counsel for JPLs: "That is not happening today. And we're glad it's not, if you see what I mean, Your Honor.").

This reality distinguishes every prior case that the Court or the parties have identified that courts concluded involved "collective" action. One leading case, for example, instructs that a "collective proceeding is one that considers the rights and objectives of *all* creditors," and that is for the "general benefit of creditors." *In re Ashapura*, 480 B.R. at 136 (citations omitted; emphasis in original). This concept "contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action." *Id.* (citations omitted). And "[o]ther characteristics of a collective proceeding include:

16

. . . provisions for the distribution of assets according to statutory priorities, and a statutory mechanism for creditors to seek court review of the proceeding." *Id.* at 137 (internal citations omitted). Other cases agree. *See, e.g.*, *In re British Am. Ins. Co. Ltd.*, 425 B.R. 884, 902 (Bankr. S.D. Fla. 2010) ("For a proceeding to be collective within the meaning of section 101(23), it must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors."); *In re Betcorp*, 400 B.R. at 281 (noting that a "collective proceeding is one that considers the rights and obligations of all creditors" and holding that a voluntary liquidation abroad qualifies, where the "procedure is compulsory" and "any attempt by a creditor to undermine the collective nature of liquidation is outlawed").

This interpretation is informed by the "objectives" of Chapter 15 to, among other things, ensure the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors," *In re Ashapura*, 480 B.R. at 137 (citing 11 U.S.C. § 1501), and the "suggest[ion]" in the UNCITRAL Guide to Enactment that "a foreign proceeding must contemplate the involvement of creditors collectively," *id.* (quoting *In re British Am. Ins.*, 425 B.R. at 902) (internal quotation marks omitted). Courts often contrast this required characteristic to efforts by individual creditors to advance their own interests (which is not an issue here), "for example, to a receivership remedy instigated at the request, and for the benefit, of a single secured creditor." *In re Irish Bank Resolution Corp. Ltd.*, 2014 WL 9953792, at *14 (Bankr. D. Del. Apr. 30, 2014) (citations omitted); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 369–70 (Bankr. E.D.N.Y. 2009) (finding Israeli receivership proceeding was not collective in nature because it was primarily designed to benefit a single secured creditor). "A proceeding is collective if it considers the rights and obligations of all of a debtor's creditors, rather than a single creditor." *In re Poymanov*, 571 B.R. 24, 33 (Bankr. S.D.N.Y. 2017); *see In re Betcorp*, 400 B.R. at 281 (same). This Court has taken a broad view of

17

what it means to "consider" the rights of creditors, holding that a foreign proceeding can be "collective" even if some creditors are not able to participate directly. *See In re ENNIA Caribe*, 594 B.R. at 638–39 (finding proceeding collective despite possibility creditors were not allowed to participate; reasoning that relevant foreign insolvency statute ensured proceedings were in creditors' interest); *In re Ashapura*, 480 B.R. at 141 ("even if there were no opportunity . . . for unsecured creditors to participate, . . . this may still be a collective proceeding, because it involves parties other than just one class of creditor or just one party-in-interest"). Whether or not all creditors are able to participate, for a foreign proceeding to be collective, "[a]ll creditors . . . must receive notice and be able to protect their rights." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 873 (Bankr. S.D.N.Y. 2021).

As noted, the JPLs acknowledge that the Cayman Proceeding at issue here does not, at least presently, seek to identify creditors, quantify and classify Global Cord Blood Corp.'s debts, or determine a scheme of distribution to creditors on account of those debts. Indeed, the creditor body has not even received formal notice of the Cayman Proceeding, and no claim submission or review process is in place. [*See* Hr'g Tr. at 62:13–16 ("there's been no notice to creditors . . . . [and] no bar date in the Cayman proceedings . . . because the creditors aren't yet found to be at risk of not getting repaid")]. Nor has any "winding up" process begun, although the JPLs have been authorized to seek to wind-up the company's affairs if they deem it appropriate to do so. [ECF No. 2-1 at ¶ 8(b); Hr'g Tr. at 27:12–17 (The Court: "JPLs have the authority to seek to commence a winding down process . . . [b]ut they haven't done so at this time?" Counsel for JPLs: "That's right. Winding down would result in the JPL's becoming joint official liquidators.")]. So it is clear that the Cayman Proceeding does not involve all the hallmarks of "collective" proceedings envisioned by leading cases such as *Ashapura*.

18

The JPLs nevertheless maintain that the Cayman Proceeding *is* "collective," because it seeks to benefit the corporation as a whole and all of its constituencies, rather than constituting a receivership or other collection activity taken on behalf of Blue Ocean or some discrete subset of claimants to satisfy just their individual interests. They further contend that there has been no need to facilitate the submission of claims or a claim review process, because they hope that Global Cord Blood Corp. remains solvent and will be able to pay all its creditors and other stakeholders, such as holders of equity. They point to no cases holding that "collective" action is present in cases involving action taken for the intended benefit of a corporation as a whole without specific reference to the existence or rights of "creditors," but they argue that that characteristic was merely a factual indicator of "collective" action in other cases, and does not preclude finding an action to be "collective" so long as it seeks to benefit a company as a whole. [Hr'g Tr. at 22:23–23:4].

The JPLs' position has some logical appeal, but the Court declines to adopt it. All relevant case law, including *Ashapura*, unequivocally and at length invokes a focus on and involvement of "creditors" as the main definitional hallmark of "collective" action within the meaning of section 101(23). *See, e.g.*, *In re Ashapura*, 480 B.R. at 136 ("First and foremost, '[a] collective proceeding is one that considers the rights and obligations of all creditors'—that is for the general benefit of creditors.") (quoting *In re Betcorp*, 480 B.R. at 281); *In re British Am. Ins.*, 425 B.R. at 902 ("the word 'collective' . . . contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action"). As of now there is nothing about the Cayman Proceeding that is specifically oriented toward creditors. Rather, the Cayman Proceeding was commenced by concerned shareholders that say they seek to benefit the company by seeking relief and a recovery of funds that allegedly have

been dissipated or improperly transferred due to an alleged fraud and other fiduciary breaches by management and/or board members.

Courts' consistent focus on the existence of creditor-related proceedings abroad reflects the overall purpose and focus of Chapter 15, and avoids expanding Chapter 15 to provide Bankruptcy Court assistance for any foreign proceeding aimed at counteracting corporate fraud and making victimized corporations or shareholders whole. The Bankruptcy Code unmistakably expresses the "purpose" of Chapter 15 as being to assist foreign courts dealing with "insolvency": "The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ." 11 U.S.C. § 1501(a). The Code further identifies as Chapter 15's first stated "objective[]" to be "cooperation between" U.S. courts and "the courts and other competent authorities of foreign countries involved in cross-border insolvency cases." 11 U.S.C. § 1501(a)(1). This overarching statutory emphasis on "insolvency" explains and confirms the case law's focus on the role of and impact on creditors in determining whether a proceeding is "collective" and thus a "foreign proceeding" that is eligible to trigger Chapter 15 processes. *See generally King v. Time Warner*, 894 F.3d at 477 ("we look to the statutory scheme as a whole and place the particular provision within the context of that statute") (internal punctuation and citation omitted).

In reaching this conclusion, the Court considered and was given pause by the JPLs' correct observation that, as a general matter, eligibility for Chapter 15 relief is to be "broadly construed." *See, e.g.*, *In re Telecom Argentina*, 2006 WL 686867, at *21. But "broad" construction cannot be limitless, and here the proposition advanced by the JPLs exceeds the bounds of any prior on-point case law, and the text of Code section 101(23) when construed in keeping with the structure and intent of the statute of which it forms an important part.

Accordingly, the JPLs here are not engaged in a "collective" action as contemplated by the Bankruptcy Code.   As a result, this case is not a "foreign proceeding" as defined by section 101(23), and recognition is denied.

### 2.   "Under a Law Relating to Insolvency or Adjustment of Debt"

Second, section 101(23) requires that the proceeding abroad arises "under a law relating to insolvency or adjustment of debt."   Although this element is not beyond reasonable dispute here, the Court concludes that the Cayman Proceeding satisfies this required attribute of "foreign proceedings" within the meaning of section 101(23).

The Objectors argue that the Cayman Proceeding is founded on portions of the Companies Act that do not address insolvency or a winding up, and no winding up process has been initiated. [ECF No. 12 at ¶ 44].   Rather, they argue, relief has been granted under Companies Act sections 92(e) and 104(2), which provide remedies including replacement of incumbent management where "just and equitable," with no showing of insolvency required and no requirement that the proceeding be aimed at identifying or defining the rights of creditors.   [*Id.* at ¶ 53].

The Cayman Companies Act, however, is a comprehensive statute dealing with multiple questions relating to corporations, including both general corporate governance and remedies for varied types of corporate malfeasance, and insolvencies and the winding up of insolvent entities. [*See generally* ECF No. 14-1 (complete text of Companies Act)].   The question thus becomes how granularly to define the "law" under which the foreign proceeding arises, and how loosely to construe the statute's requirement that the foreign proceeding simply be under a law that "relat[es] to" insolvency or adjustment of debt.   The Cayman Companies Act as a whole unquestionably includes provisions that satisfy this element of the definition of "foreign proceeding," but the

subsections that have been invoked in the Cayman Proceeding at issue here do not invoke any of

the Companies Act provisions that most clearly meet this requirement.  The JPLs, however, have

been authorized to commence a winding up process if they decide that would be appropriate, and

that process, if commenced, appears more likely to constitute or resemble a liquidation.

The relevant test is not whether the currently pending *proceeding* concerns insolvency or

adjustment of debtors, or even whether the current proceeding in some sense relates to those

objectives, but rather whether the proceeding is being brought under a "law" that "relat[es] to"

insolvency or adjustment of debt.  Further, section 101(23) is to be "broadly construed."  *E.g., In

re MMG LLC*, 256 B.R. at 550.  This guidance counsels against an unduly grudging application of

this flexibly worded test by narrowly examining whether the specific subsections of the governing

Cayman statutory scheme that are presently being applied redress insolvency or creditor rights.

*See In re Betcorp*, 400 B.R. at 282 (for law to be "related to" insolvency, company need not be

insolvent or contemplating debt adjustment; unified Australian Corporations Act that governs both

insolvencies and other corporate matters suffices); *In re Ashapura*, 480 B.R. at 138 ("The fact that

a proceeding has a 'unified structure of the external administration provisions' favors a finding

that the statute meets this criterion.") (citing *In re Betcorp*, 400 B.R. at 282).  Rather, given the

flexibility encouraged by merely requiring that the governing law "relat[e] to" insolvency or the

adjustment of debt, the Court concludes that the Cayman Proceeding meets this aspect of the

section 101(23) test for foreign proceedings.

### 3.   "For the Purpose of Reorganization or Liquidation"

The final required element of section 101(23)'s definition of "foreign proceeding" is

whether the proceeding abroad is "for the purpose of reorganization or liquidation."  *In re

Ashapura*, 480 B.R. at 136; *In re ENNIA Caribe*, 594 B.R. at 638.  The Cayman Proceeding is not.

The JPL Appointment Order does not confer powers of reorganization.  Rather, the JPLs have been granted powers for the purpose of preserving Global Cord Blood Corp.'s assets and investigating and reporting on the company's affairs.

As discussed above, no "winding up" process has been commenced in the Cayman Proceeding, nor is any effort underway to "liquidate" corporate assets or the corporation itself. The JPLs do not even contend that, at this time, a "liquidation" is being pursued, or is the current purpose of the proceeding.  Indeed, the JPLs say they seek to avoid the need for such measures. [Hr'g Tr. at 22:14–22].  The Court views this reality as fatal to the JPLs' effort to satisfy this element based on the possibility that a liquidation or reorganization may be necessary in the future if the JPLs' current asset recovery and corporate governance efforts fail.  *Cf. In re British Am. Ins.*, 425 B.R. at 906 (because the foreign court "had ordered neither a winding up nor a reorganization . . . [the proceeding] was not 'for the purpose of reorganization or liquidation' and therefore was not a 'foreign proceeding'").

The JPLs argue that courts routinely grant Chapter 15 recognition to Cayman proceedings brought under the Companies Act.  [ECF No. 2 (citing *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 701–02 (Bankr. S.D.N.Y. 2017); *In re Suntech Power Holdings Co., Ltd.*, 520 B.R. 399 (Bankr. S.D.N.Y. 2014))].  Yet, while recognition is routine in appropriate circumstances, it is not indiscriminate.  On this point, the Objectors appear correct that all instances of recognition of Cayman Companies Act proceedings have involved Cayman proceedings that, in one way or another, directly concerned creditor issues, entity debts, or a winding up or liquidation of the company in question.  *See In re Ocean Rig*, 570 B.R. at 701–02 ("This Court and others have previously held that insolvency or debt adjustment proceedings (including provisional liquidations) and schemes of arrangement under Cayman Islands law qualify as foreign

proceedings under chapter 15 of the Bankruptcy Code."); *In re Millard*, 501 B.R. at 647 (recognizing Cayman bankruptcy proceeding involving insolvent individuals).

Frequently when Cayman proceedings are recognized, the Grand Court has entered a winding up order and/or appointed an official liquidator or joint official liquidators. *See In re Platinum Partners Value Arbitrage Intermediate Fund Ltd.*, Case No. 17-12269, Dkt. Nos. 3-2, 12 (Bankr. S.D.N.Y. 2017) (recognizing Cayman proceeding where Grand Court entered winding up order and appointed official liquidators in liquidation proceeding started by a creditor); *In re AJW Offshore Ltd.*, Case No. 13-70078, Dkt. Nos. 3-1, 31 (Bankr. E.D.N.Y. 2013) (recognizing Cayman proceeding where Grand Court entered winding up order and appointed official liquidators in Companies Act § 124 voluntary liquidation); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, Case No. 09-13985 Dkt. Nos. 2-3, 47 (Bankr. D. Del. 2009) (recognizing Cayman proceeding where Grand Court entered winding up order and appointed official liquidators).

U.S. courts also frequently grant the recognition petitions of provisional liquidators when the underlying proceeding concerns insolvency, including where JPLs are appointed under Companies Act section 104(3) (on the grounds that "the company is or is likely to become unable to pay its debts," and "the company intends to present a compromise or arrangement to its creditors") or where the Grand Court grants the JPLs authority under Companies Act section 86 (the power to enter into a "compromise or arrangement" between a company and its creditors). *See In re Luckin Coffee Inc.*, Case No. 21-10228, Dkt. No. 48 (Bankr. S.D.N.Y. Feb. 5, 2021) (recognizing Cayman proceeding where Grand Court appointed JPLs under § 104(3) and conferred authority under § 86); *In re Suntech*, 520 B.R. at 406 (recognizing Cayman proceeding where Grand Court appointed JPLs with powers pursuant to § 86); *In re Ocean Rig*, 570 B.R. 687, 690–91, Case No. 17-10736 Dkt. 1 at 5–6 (Bankr. S.D.N.Y. 2017) (recognizing Cayman proceeding

where Grand Court appointed JPLs with power to "consider," "promote," and "enter into" restructuring agreement between company and its creditors); *In re LDK Solar Co., Ltd.*, Case No. 14-12387, Dkt. Nos. 3, 43 (Bankr. D. Del. 2014) (recognizing Cayman proceeding where Grand Court granted petition brought under Companies Act § 92(d) and appointed JPLs under § 104(1) with authority to promote a scheme of arrangement under § 86).

Here, the JPLs note that, on Blue Ocean's request for alternative relief, the Grand Court has authorized the JPLs "to commence winding up proceedings," [ECF No. 2-1 at ¶ 8(b)], if in their discretion they determine it appropriate to do so, and without the need for "further sanction or order of the [Grand] Court," [*id.* at ¶ 8]. The JPLs acknowledge they have not done so and hope that they never will. [Hr'g Tr. at 22:14–22]. The JPLs cite no case finding such an alternative and not yet in-progress possibility satisfies the requirement of section 101(23) that a proceeding be for purposes of liquidation. The Court concludes that where, as here, the JPLs aver that they hope never to need to liquidate the company or even its assets, the mere possibility that a liquidation could occur down the road is not sufficient to make the "purpose" of the Cayman Proceeding the "liquidation" of the corporation or its affairs.

If and when the Cayman Proceeding shifts to an active liquidation process, this element may well be satisfied. *Cf. In re Betcorp*, 400 B.R. at 285 (element satisfied where declarant stated "that the purpose of the winding up is to liquidate" the company). But at present, the focus of the JPLs' efforts and of the Cayman Proceeding is to investigate possible wrongful dissipation of corporate assets, and to take appropriate remedial steps that the JPLs hope will succeed without any liquidation being required. That simply does not constitute "liquidation" according to any definition known to the Court or identified by the JPLs.

The JPLs also argue, without authority, that they are engaged in a corporate "reorganization" because the Cayman Proceeding has removed prior controlling board members from authority and conferred broad powers on the JPLs. [ECF No. 26 at ¶ 17 (citing ECF No. 27 at ¶¶ 39–43); Hr'g Tr. at 33:10–12]. Be that as it may, the JPLs cite no authority deeming the relief now being sought by the JPLs and the measures they are taking to constitute a "reorganization" of the corporation itself. Nothing in the portions of the Cayman Companies Act under which the JPLs have been appointed or vested with authority characterizes them as being engaged in a corporate "reorganization." [*See* ECF Nos. 3-3 at ¶¶ 70, 71.1 (petitioning the Grand Court for relief "pursuant to section 95(3)" and, alternatively, "92(e)"), 2-1 at 1 (appointing JPLs "pursuant to section 104(2)")]. *Compare* Companies Act § 95(3) (just and equitable winding up), *id.* at § 92(e) ("company may be wound up by the Court if . . . just and equitable"), *and id.* at § 104(2) (providing for appointment of JPLs where "necessary" to "prevent dissipation or misuse of the company's assets" or "prevent mismanagement or misconduct" by company directors); *with id.* at § 92(d) ("company may be wound up by the Court if . . . unable to pay its debts"), *id.* at § 104(3) (providing for appointment of JPLs where "company is or is likely to become unable to pay its debts"), *and id.* at § 86 (court may sanction a "compromise or arrangement" between a company and its creditors; defining "arrangement" to include "a reorgani[z]ation of the share capital of the company"). The JPLs have not identified any contemplated liquidation or identification and compensation of creditors, as noted above; nor have they pointed to any modified capitalization or change in stock ownership or shareholder entitlements. Rather, what the JPLs point to—the Grand Court's conferring of various investigatory and other corporate powers on the JPLs, and the JPLs' investigation and anticipated pursuit of allegedly misdirected corporate funds and remedies for alleged self-interested transactions by corporate insiders—does

not constitute a "reorganization" under any authority identified by the JPLs or known to the Court. Nor do these measures resemble the common legal or layperson understandings of the word "reorganization." *See Reorganization, Black's Law Dictionary* (11th ed. 2019) (defining "reorganization" as "[a] financial restructuring of a corporation, esp. in the repayment of debts, under a plan created by a trustee and approved by a court"); *see also Merriam-Webster's Collegiate Dictionary* 991 (10th ed. 1997) (defining "reorganization" as "the act or process of reorganizing" and defining the verb "reorganize" as "to organize again or anew").

The conclusion that the Cayman Proceeding is not for the "purpose of reorganization or liquidation" is reinforced by reference to the UNCITRAL Enactment Guide, which is an appropriate source for construing the meaning of Chapter 15's provisions because Chapter 15 is designed to implement UNCITRAL consistent with its usage internationally. *See* 11 U.S.C. §§ 1501 ("The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency," adopted by the United Nations Commission on International Trade Law ("UNCITRAL") in 1997), 1508 ("In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."); *In re Ashapura*, 480 B.R. at 135, 137 (relying on UNCITRAL and Enactment Guide). In relevant part, the Enactment Guide states: "Some types of proceeding that may satisfy certain elements of the definition of foreign proceeding . . . may nevertheless be ineligible for recognition because they are not for the stated purpose of reorganization or liquidation." U.N. Comm'n on Int'l Law, UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, ¶ 77 (2014). Further, among the proceedings contemplated to be ineligible are those, like the Cayman Proceeding, "designed to prevent dissipation and waste, rather than to liquidate or reorganize [an] insolvency estate," as well as "proceedings designed to

27

prevent detriment to investors rather than to all creditors (in which case the proceeding is also likely not to be a collective proceeding)." *Id.* Furthermore, proceedings may be ineligible where "powers conferred and the duties imposed upon the foreign representative are more limited than the powers or duties typically associated with liquidation or reorganization, for example, the power to do no more than preserve assets." *Id.*

This conclusion is further reinforced by the actions of the Cayman Grand Court itself in the Cayman Proceeding, which do not communicate a belief that that proceeding relates to insolvency or is in need of this Court's aid under Chapter 15. As noted above, the JPLs were not appointed under Cayman Companies Act sections 104(3), 92(d) or 86, which concern the creation of an arrangement or compromise with creditors—the Companies Act provisions most akin to U.S. reorganization proceedings. Rather, the Grand Court appointed the JPLs under sections 92(e), which implicate the Grand Court's "just and equitable" powers, and 104(2), with its threefold purpose (i) to prevent the dissipation or misuse of the company's assets; (ii) to prevent the oppression of minority shareholders; or (iii) to prevent mismanagement or misconduct on the part of the company's directors. [ECF Nos. 3-5 at ¶¶ 2, 13, 14 ("In this case, reliance is placed on subsection[s] . . . [104](2)(i) and (iii)"), 2-1 at 2]; *accord* Companies Act §§ 92(e), 104(2)(b). And while the Appointment Order authorized the JPLs to seek the assistance of courts in other nations without limitation, that order mentioned only the PRC and Hong Kong as specifically contemplated jurisdictions whose assistance might be sought, and referenced as a contemplated objective "obtaining information to assist [the JPLs] in their investigations" [ECF No. 2-1 at ¶ 10]—exactly what the JPLs seek to do through the Texas 1782 Proceeding. Thus, nothing in the Appointment Order signals that the Cayman Grand Court understands itself to be presiding over an insolvency proceeding or contemplating U.S.-based assistance under Chapter 15.

Finally, the JPLs' position is not saved by their citation of *Millard* and that case's citation of the Collier treatise's observation that insolvency need not be proved to proceed under Chapter 15, or that solvent petitioners in financial distress can be eligible for Chapter 15 relief. [Hr'g Tr. 19:1–24]. *Millard* is materially distinguishable on its facts, and does not support the conclusion the JPLs propose here. In *Millard*, the party opposing recognition argued that, even though the proceedings in the Cayman Islands were styled and pursued as insolvency proceedings, the foreign representatives in that case had not in fact established "insolvency" because many debts at issue were tax obligations that "are not provable as debts in the Caymans." *In re Millard*, 501 B.R. at 648. Judge Gerber, then of this Court, held that he "can't agree" that a U.S. court should engage in its own solvency inquiry and grant recognition only if the U.S. court concludes insolvency is present. *Id.* Further, the passage from *Millard* emphasized by the JPLs here (which drew on Collier) was not a blanket pass to Chapter 15 recognition of all Cayman proceedings, but rather observed that the "words 'under a law relating to insolvency or adjustment of debt' in section 101(23) emphasize that Chapter 15 is available not only to debtors that are technically insolvent or facing liquidation, but also to debtors who are in distress and may need to reorganize." *Id.* at 649–50 (quoting 8 Collier ¶ 1501.03[1] (16th ed. 2013)). This Court agrees, but reorganization and/or debt adjustment was clearly contemplated on the facts of *Millard*, where the Cayman proceeding was explicitly styled as an insolvency or debt-adjustment proceeding. *Millard* accordingly does not require recognition here, where no such effort is underway and the JPLs characterize the Company as solvent and seeking to avoid liquidation or reorganization, notwithstanding that the JPLs believe the Company has incurred a major misappropriation that the JPLs seek to remedy. This conclusion is consistent with the very next sentence of *Millard*, which emphasizes it is the "*nature of the proceeding that is the subject of the request for assistance . . .*

that governs the inquiry." *Id.* at 650 (emphasis in original).  Here, careful review of the record shows that the Cayman Proceeding does not satisfy the definitional requirements of section 101(23) for the reasons described at length above, in essence, because the Cayman Proceeding does not involve fixing or adjusting debts or creditors' rights, and instead serves the current purpose of investigating suspected misconduct, and locating and recovering corporate assets.

Accordingly, recognition is denied for the further and independent reason that the Cayman Proceeding is not for the purpose of reorganization or liquidation.

## CONCLUSION

For the reasons stated above, the Court denies the JPLs' Chapter 15 Petition for Recognition and Related Relief without prejudice to future applications by the JPLs or other authorized representatives, if warranted by future developments in the Cayman Proceeding or elsewhere.  Counsel for Golden Med is to settle a proposed order to that effect.

It is so ORDERED.

Dated: New York, New York
       December 5, 2022

                          *s/ David S. Jones*
                          Honorable David S. Jones
                          United States Bankruptcy Judge